Argued and submitted November 26, 2002, affirmed February 19, 2003

## STATE OF OREGON,
*Respondent,*

*v.*

## RICARDO EFRA RODRIGUEZ-GANEGAR,
wtn: Julio Cesar Redondo,
aka Carlos Martinez-Paz,
*Appellant.*

### C000966CR; A112239

63 P3d 1225

Peter Gartlan, Chief Deputy Public Defender, argued the cause for appellant. With him on the brief was David E. Groom, Acting Executive Director, Office of Public Defense Services.

Laura S. Anderson, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Armstrong and Brewer, Judges.

BREWER, J.

Armstrong, J., dissenting.

## BREWER, J.

Defendant appeals his convictions for two counts of possession of a controlled substance, one count of hindering prosecution, and one count of tampering with physical evidence. He asserts that the trial court erred in denying his motion, under Article I, section 9, of the Oregon Constitution, to suppress evidence obtained from a police search of a motel room that he occupied.[1] The issues presented are (1) whether the police engaged in an unlawful search of the motel room when an officer observed, through a small gap in the room's window curtains, an occupant packaging large amounts of contraband inside the room; and (2) if not, whether, after observing the drug activity, the officers were authorized by exigent circumstances to knock on the door and enter the room without a warrant after the occupants refused to consent to that entry. Defendant does not challenge the trial court's extensive written findings of fact. Accordingly, those findings bind us on appeal, and we review the court's conclusions for errors of law. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). We affirm.

On April 7, 2000, at approximately 11:00 p.m., Officer Coulson was dispatched to a Beaverton motel to investigate the presence of a suspicious person. When Coulson reached the motel's second floor exterior walkway, he heard a banging noise coming from the direction of room 215. He walked toward the sound. The noise stopped momentarily, and Coulson stood a few inches from the window of room 215, with his back toward the window. He was standing at the outer edge of the window, farthest from the door to the room. The banging noise resumed and Coulson turned to face the window. A three-fourths to one-inch gap in the curtains extended uniformly from the top to the bottom in the middle of the window. Coulson looked through the gap and saw a man, Morales, seated at a desk that was located in the near part of the room against a wall next to the door. The man was

---

[1] Article I, section 9, of the Oregon Constitution provides, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]" Defendant makes no claim under the United States Constitution.

holding what appeared to be a credit card, which he was banging up and down on a pile of a white substance. He would then scrape the substance across the desk toward him into a plastic bag. Based on his training and experience, Coulson believed that the man was packaging cocaine for sale.

Coulson then called his supervisor, Sergeant Moran, who joined him at the scene eight minutes later. Moran looked through the same gap in the curtains and saw a dark colored substance that he recognized as marijuana. Moran also saw the same man banging and scraping the substance across the desk. The officers discussed the situation and decided to engage in a "knock and talk" in order to try to obtain the occupants' consent to search the room. They also called for backup and, in response, Sergeants Priem and Davies came to the scene. While he waited for the backup officers, Moran went to the motel manager's office, obtained a key to room 215, and was told that the room was rented for one night to a woman, Saloum.

After all four officers were present, Coulson knocked lightly on the door for 10 to 15 seconds but did not otherwise announce his presence. The officers heard movement inside the room, and one of the occupants opened the curtains. One of the officers then announced that they were police. Coulson knocked louder, and the movements inside the room became more frantic. Coulson tried to open the door with the key but someone inside held it shut. Finally, the door opened and two people—defendant and Morales—were standing inside. The officers ordered the men outside onto the walkway. The officers entered the room and saw a trail of white powdery substance and black chunks on the floor leading from the desk to the bathroom in the back of the room. They followed the trail and found a black chunk inside the toilet bowl and a wadded up bath towel lying on the floor with black chunks on it. In the ensuing search, the officers also found sandwich-type baggies in the room and a box of powdered sugar that could be used as a cutting agent for cocaine. Moran field tested the black chunky substance, and it tested positive for heroin. Priem field tested the white powdery substance, and it tested positive for cocaine.

The trial court denied defendant's motion to suppress, concluding:

"1.   The officers had the right to be outside the motel room and could see the drugs being packaged in plain view.

"2.   There was no search and the defendants did not have any expectation of privacy.

"3.   There were exigent circumstances which obviated the need for a warrant for several reasons:

"a.   There was a danger that the drugs would be consumed before a warrant could be obtained.

"b.   The named lessee of the room was not in the room and could return at any time which could alert the occupants of the room to the presence of the police, causing the drugs to be destroyed; and

"c.   When the officers knocked on the door to request consent to search (which they had the right to do) the defendants attempted to destroy the drugs."

A jury convicted defendant of the three charges described above. On appeal, he challenges only the denial of his motion to suppress.

We begin with the question whether Coulson's observations through the gap in the curtains invaded a privacy interest, protected by Article I, section 9, against unreasonable searches and seizures. *State v. Campbell*, 306 Or 157, 163, 759 P2d 1040 (1988). Such interests are defined by an objective test that asks whether the government's conduct "would significantly impair an individual's interest in freedom from scrutiny, *i.e.*, his [or her] privacy." *State v. Dixson / Digby*, 307 Or 195, 211, 766 P2d 1015 (1988). Any police conduct that significantly impairs such an interest is classified as a search. *State v. Ainsworth*, 310 Or 613, 616, 801 P2d 749 (1990). This court often has said that an indication of whether police conduct constitutes a search is "whether a private individual would offend social and legal norms of behavior by engaging in the same kind of intrusion." *State v. Portrey*, 134 Or App 460, 464, 896 P2d 7 (1995).[2] The constitutionally protected privacy interest

---

[2] That statement derives from *Campbell*, 306 Or at 170. However, viewed in isolation it expresses an incomplete understanding of the relationship between

"is not one of freedom from scrutiny in general, because, if that were the case, any form of scrutiny would infringe a privacy interest and thereby be considered a search. A court has never held, for example, that a police officer engages in a search by making unaided observations from a public place, and an individual therefore cannot be said to have a constitutionally protected interest in freedom from such scrutiny."

*Campbell*, 306 Or at 170. Thus, people may sacrifice their privacy interests by conducting themselves "in otherwise protected areas in such a way that their words or acts can plainly be seen or heard outside without any special effort." *State v. Louis*, 296 Or 57, 61, 672 P2d 708 (1983). In short, when a police officer makes an "unaided observation, purposive or not, from a lawful vantage point," no search occurs. *Ainsworth*, 310 Or at 621.

In support of his argument that Coulson's observations constituted a search, defendant relies primarily on two decisions of this court. In the first, *State v. Gabbard*, 129 Or App 122, 124, 877 P2d 1217, *rev den*, 320 Or 131 (1994), police received an anonymous tip that the defendant was manufacturing methamphetamine at his property. Two detectives went to investigate and parked their vehicle between the defendant's house and a shed. When the detectives got out of their vehicle, the defendant came out of the shed and approached them. One of the detectives smelled an odor that he associated with the manufacture of methamphetamine. The detective, who was six feet tall, approached the shed and bent down to look through a crack in the siding about four and one-half feet above the ground. We held that, even though the detectives were lawfully on the property,

---

social and legal norms of behavior and individual privacy interests. In *Campbell*, the court also said:

"Our intention is not to set forth a definition of search based upon social and legal norms of behavior but to clarify the nature of the interest protected by Article I, section 9. Social and legal norms cannot govern the scope of the constitutional provision, which itself plays a substantial role in shaping those norms."

*Id.* at 171. Our disagreement with Judge Armstrong's dissent stems primarily from his undue emphasis on his view of what is "socially inappropriate" in the circumstances of this case, a view to which—even if it were dispositive—we would not subscribe. 186 Or App at 543 (Armstrong, J., dissenting).

"[the detective's] view into the shed through the cracks in the siding was a search * * *." *Id.* at 130.[3]

Defendant also relies on *State v. Fortmeyer/Palmer*, 178 Or App 485, 37 P3d 223 (2001). In *Fortmeyer/Palmer*, based on information that they had received, police officers went to the defendants' residence to request consent to search for a marijuana growing operation. The defendants refused to give consent to search, so the officers obtained permission from a neighbor to enter a common side yard between the neighbor's house and the defendants' residence. From that vantage point, the officers saw a basement window in the defendants' house that was obscured by a door panel leaning against the house and cardboard placed inside the window. Despite those obstructions, by kneeling down at a particular angle and turning their heads, the officers could see growing marijuana through a crack in the window. *Id.* at 487-88. Based on their observations, the officers obtained a search warrant, and the defendants ultimately were charged with various drug offenses relating to the growing operation. *Id.*

On appeal, we held that the trial court had erred in denying the defendants' motion to suppress because the officers' observations from the side yard constituted an unlawful warrantless search. We reasoned:

"While the officers in this case had obtained a lawful vantage point, defendants still retained a privacy interest in items in the common area and within the house that were not entirely visible to someone standing there. The officers testified that, to see the room with the marijuana in it, they had to kneel down at a particular angle and turn their heads toward the crack in the otherwise obstructed basement window. To find strangers, on their knees, attempting to peer through what appears to be a covered basement window, would be suspicious, uncommon, and unacceptable in our society. * * * [P]ermitting the government to engage in such conduct—particularly where an individual has taken extra, albeit imperfect, measures to ensure his or her privacy—would significantly impair an individual's interest in freedom from scrutiny. Therefore,

---

[3] We upheld the search, although it was warrantless, based on the existence of probable cause and exigent circumstances. *Gabbard*, 129 Or App at 130.

we conclude that the officers' conduct constituted a search of defendant's home under Article I, section 9, of the Oregon Constitution."

*Id.* at 491-92.

Two differences distinguish this case from *Gabbard* and *Fortmeyer/Palmer* and, in their totality, compel a different result here.

■ First, there is no evidence that Coulson had to make any special effort to see into room 215. Defendant contends that this case is similar to *Fortmeyer/Palmer* and *Gabbard*, because "one had to position himself virtually flush up to the window to steal even a partial glimpse into the room. * * * Effectively, to condone this conduct, the state must condone Peeping Toms and voyeurs who spy on their neighbors * * *." If defendant's characterization of the facts were accurate, his point might be better taken. However, the trial court's findings do not support that factual characterization, nor does the record. Coulson testified that the gap in the curtains extended uniformly from top to bottom in the middle of the window. He also testified that, when his attention was drawn to the window, he was standing at the edge of the window about three or four inches away from it and that he made his observation from that vantage point. Moran testified that he could see what was going on in the room standing back "maybe a foot or so" from the window. He also testified that, "[i]f you put your face toward the window, you could see quite a bit of that area of the apartment, or of the motel room." Unlike in *Gabbard*, there is no evidence that Coulson had to bend over to a lower height and, unlike in *Fortmeyer/Palmer*, there is no evidence that he had to crouch, peer, kneel, or otherwise adjust his position in order to make the challenged observations.

Second, unlike in *Fortmeyer/Palmer*, there is no evidence that the occupants of room 215 had taken "extra" measures to ensure their privacy. In contrast to the cardboard and door panel that partially obscured the window in that case, here, the occupants left a gap in the curtains from which the interior of the room was plainly visible to any passerby whose attention might be drawn to activities inside the

room. The gap in the curtains just as likely reflected the occupants' carelessness and inattention to their privacy interests as it did an extra effort to safeguard them.

In sum, from a lawful vantage point and without special effort, Coulson observed illegal activity when his attention happened to be drawn to the window of a motel room by a series of loud noises caused late at night by an occupant of that room. Under the circumstances, the occupants of the room sacrificed any right of privacy by conducting themselves in such a way that their activities could be seen without any special effort. *See Louis*, 296 Or at 61. The trial court did not err in concluding that the challenged observations did not constitute a search.

We turn to defendant's alternative argument that the officers lacked authority to enter the motel room without the occupants' consent and that the ensuing search of the room was unlawful. Warrantless searches are *per se* unreasonable unless the state shows, by a preponderance of the evidence, that the search falls within an established exception to the warrant requirement. *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983). Probable cause accompanied by exigent circumstances is one such exception. *Id*. Exigency exists when the police must act quickly to forestall the destruction, disappearance, or dissipation of evidence. *State v. Nagel*, 320 Or 24, 33, 880 P2d 451 (1994).

Defendant argues that the officers created their own exigency by knocking on the motel room door. He relies on *State v. Matsen / Wilson*, 287 Or 581, 587, 601 P2d 784 (1979), where the Supreme Court held that the presence of drugs does not *ipso facto* create exigent circumstances. In *Matsen / Wilson*, the police had engaged in a two-week long investigation of drug activity at a residence and had developed probable cause to obtain a "John Doe" search warrant for the premises. However, hoping to identify a drug supplier, the officers watched the residence for nearly a week. Finally, one afternoon at 2:00 p.m., the officers learned that the supplier would be bringing a large quantity of drugs to the residence. At 3:00 p.m., the officers entered the residence without a warrant and handcuffed the defendant and the supplier. At 6:30 p.m., the officers obtained a search warrant and, while

executing it, discovered evidence that the defendant challenged in a motion to suppress. The Supreme Court reversed our decision affirming the trial court's denial of that motion. The court held that the police had created their own exigency by failing to seek a search warrant during the previous week, even though they had had probable cause to obtain one. *Id.* at 586-87. The court also held that the state had failed to prove that destruction of the contraband or the escape of the defendants was imminent. *Id.* at 587.

Defendant also relies on *State v. Price*, 92 Or App 669, 759 P2d 1130 (1988), where the defendant was charged with possession of less than an ounce of marijuana that police found in her purse after seizing it at her work place. The police had learned from an informant that the defendant regularly brought marijuana to work and used it on breaks. *Id.* at 672-73. We held that the risk that the defendant might conceal or destroy the evidence arose as a result of the officers' own inquiry and that no exigency existed when the defendant's purse was seized. *Id.* at 673.

This case presents materially different circumstances from both *Matsen/Wilson* and *Price.* Here, the officers had probable cause to believe that serious drug offenses were in progress inside a motel room. The evidence showed that it likely would have taken six to eight hours to secure a search warrant, that the motel room was not a secure location, and that the room was rented to a woman who did not appear to be present at the time but could return at any time to interrupt the officers' surveillance. Moran also had learned from the motel manager that room 215 had not been rented for multiple nights. Unlike in *Matsen/Wilson* and *Price*, the officers had no reason to believe that the occupants of room 215 were engaged in repeated conduct at a regular location so that they would be available for apprehension after a search warrant could be secured. To the contrary, the officers had every reason to believe that, before a warrant could be obtained, the occupants of the room might leave or, if cognizant that they had been discovered, attempt to destroy the contraband in their possession.

Nor was there any evidence that the officers engaged in a deliberate attempt to evade the warrant requirement.

*See State v. Kosta*, 304 Or 549, 556, 748 P2d 72 (1987) (holding that the precept against "creating" an exigency generally applies to instances in which officers engage in a deliberate attempt to evade the warrant requirement); *see also State v. Isley*, 182 Or App 186, 192, 48 P3d 179 (2002). Instead, they were confronted with a working drug operation, requiring that action be taken as quickly as possible. The trial court did not err in concluding that the officers' entry into the motel room and the ensuing search of the room were justified by exigent circumstances that the officers did not, themselves, unlawfully create.[4]

Affirmed.

**ARMSTRONG, J.,** dissenting.

The majority concludes that police officers did not conduct a search by looking through a one-inch gap in curtains that covered a motel room window and watching people inside the room handle controlled substances. Because I believe that the officers conducted a search by making the observations that they did and that the search violated Article I, section 9, of the Oregon Constitution, I respectfully dissent.

Article I, section 9, provides that

"[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

The function of the provision is to protect people against intrusion by the government into their privacy. *See, e.g., State v. Campbell*, 306 Or 157, 163-65, 759 P2d 1040 (1988).

Whether something is private and, hence, protected by the provision against governmental scrutiny, may depend on social and legal norms of behavior. The court put the point this way in *Campbell*:

---

[4] Defendant does not assert that the officers lacked probable cause to believe that criminal activity was taking place inside the motel room.

"Government scrutiny aside, individual freedom from scrutiny is determined by social and legal norms of behavior, such as trespass laws and conventions against eavesdropping. * * * One explanation for the absence of a constitutionally protected interest against certain forms of government scrutiny may be the absence of any freedom from those forms of scrutiny in society at large. The reason that the observations of a police officer who is standing in a public place infringe no privacy interest may be that there is no generally recognized freedom from such scrutiny by private individuals. Such observations by the police would thus not significantly reduce the freedom from scrutiny available to 'the people.' In contrast, both laws and social conventions have long recognized the right to exclude others from certain places deemed to be private. If the government were able to enter such places without constitutional constraint, 'the people's' freedom from scrutiny would be substantially impaired."

*Id.* at 170-71 (citations omitted).

Although social and legal norms of behavior have a role to play in determining whether the government has engaged in conduct that intrudes into protected privacy, those norms do not control the scope of the provision. The provision may impose limits on police scrutiny that are greater than the limits that apply to private individuals under the relevant social and legal norms. *See id.* at 171. Conversely, however, police conduct that violates general norms of behavior is conduct that is subject to the provision, because it is conduct that subjects to scrutiny that which the relevant norms establish to be private.

We applied those principles in *State v. Fortmeyer/ Palmer*, 178 Or App 485, 37 P3d 223 (2001). There, the police went to the defendants' residence and asked for consent to search it for evidence of a marijuana growing operation. The defendants refused to consent to a search, so the officers got a neighbor to agree to permit the officers to enter a common side yard between the neighbor's and the defendants' houses. From that location, they were able to look through a basement window in the defendants' house by getting down on their knees and looking through a crack in a cardboard covering that had been placed over the window. Through that crack, they saw marijuana growing in the basement, which

led them to seek and obtain a warrant to search the house for evidence of marijuana production and sales.

On appeal from the defendants' convictions for drug offenses, we held that the trial court had erred in denying the defendants' motion to suppress the evidence obtained by the police as a result of looking through the basement window and executing the search warrant. Our holding was based on our conclusion that the police had conducted a warrantless search when they looked through the crack in the basement window. Although the officers made their observation from the common yard between the two houses, which was a place that they or anyone else who had the property owner's permission lawfully could be, the *manner* in which the officers made the observation violated social norms of behavior. We explained:

> "While the officers in this case had obtained a lawful vantage point, defendants still retained a privacy interest in items in the common area and within the house that were not entirely visible to someone standing there. The officers testified that, to see the room with the marijuana in it, they had to kneel down at a particular angle and turn their heads toward the crack in the otherwise obstructed basement window. To find strangers, on their knees, attempting to peer through what appears to be a covered basement window, would be suspicious, uncommon, and unacceptable in our society. * * * [P]ermitting the government to engage in such conduct—particularly where an individual has taken extra, albeit imperfect, measures to ensure his or her privacy—would significantly impair an individual's interest in freedom from scrutiny. Therefore, we conclude that the officers' conduct constituted a search of defendants' home under Article I, section 9, of the Oregon Constitution."

*Id.* at 491-92.

I believe that the same principle applies to the officers' conduct in this case. The officers made the observations that they did from a place that they or anyone else lawfully could be: the public walkway that extended along the front of the rooms on the second floor of the motel. However, the manner in which they observed the conduct of the people inside

the room violated social norms of behavior that protect people against scrutiny of their private conduct.

The officers made their observations through a gap in the closed curtains of the motel room. Nothing in the record suggests that the curtains were not closed as fully as they could be closed, which means that the officers could not look through the curtains into the room while standing in front of the window. However, they could and did look through the curtains by standing close to the edge of the window and looking at an angle through a gap in the curtains where one curtain slid in front of the other. In doing that, they behaved in a way that would be suspicious, uncommon, and unacceptable for anyone else to behave in seeking to scrutinize the private conduct of people inside the room.

I reach the conclusion that I do because I believe that it is understood to be socially inappropriate for someone to look through the closed curtains of a motel room in the manner in which the officers did to satisfy the person's interest or curiosity about the conduct of the people inside the room. For example, if someone (or the officers, for that matter) heard sounds emanating from the room that suggested that people were making love in it, the person would violate ORS 163.700(1)(b) by looking into the room in the manner that the officers did if the person did so to arouse or gratify the person's sexual desire.

ORS 163.700(1)(b) makes it a crime to observe a person in a state of nudity without that person's consent if the observation is made to arouse or satisfy the sexual desire of the observer and the nude person who is observed "is in a place and circumstances where the person has a reasonable expectation of personal privacy." ORS 163.700(1)(b). The statute defines the above-quoted phrase to include places such as the motel room in this case if the place "is not open to public view." ORS 163.700(2)(c). It goes on to define an area that *is* open to public view as an area that "can be readily seen" and in which a "person within the area can be distinguished by normal unaided vision when viewed from a public place as defined in ORS 161.015." ORS 163.700(2)(d). Under those provisions, the walkway in front of the motel room was a public place under ORS 161.015 and it was possible to

observe people inside the room using normal, unaided vision. Nevertheless, I believe that the effort required to look through the curtains to see the people in the room means that the room was *not* an area that could be readily seen. Consequently, the statute would cover the conduct that I have described in my hypothetical example.

Although the statute would not apply to equivalent efforts to observe people inside the motel room for purposes other than arousing or gratifying the sexual desire of the observer, I believe that the distinction that the statute makes between areas that can and cannot be readily seen is a distinction that is well established in our society. That distinction bears, in turn, on whether a person has engaged in behavior that violates social norms in order to observe that which is understood to be private. Because the officers violated social norms of behavior in order to see what was behind the closed curtains of the motel room, I believe that they conducted a search that was subject to Article I, section 9.

In summary, the police violated social norms of behavior by making the observations that they did through the closed curtains of the motel room, thereby intruding into the privacy of the people inside the room. In doing so, they conducted a warrantless search of the room that violated Article I, section 9. Consequently, the trial court erred in denying defendant's motion to suppress the evidence obtained as a result of the search. I respectfully dissent from the majority's contrary conclusion.