Argued and submitted December 23, 2002, affirmed March 6, 2003

# STATE OF OREGON,
*Respondent,*

*v.*

# MARIO CASTILLO-SALGADO,
*Appellant.*

## C991450CR; A112055

64 P3d 1169

Peter Gartlan, Chief Deputy Public Defender, argued the cause for appellant. With him on the brief was David E. Groom, Acting Executive Director, Office of Public Defense Services.

Doug M. Petrina, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Deits, Chief Judge, and Kistler, Judge.

EDMONDS, P. J.

## EDMONDS, P. J.

■ Defendant appeals a conviction for possession of cocaine. ORS 475.992. Defendant assigns error to the trial court's denial of his motion to suppress evidence obtained without a warrant. The issue is whether police conducted an unlawful search when they looked through a gap in Venetian blinds into a kitchen window of an apartment without a warrant as they approached the front door of the apartment. We review for errors of law and are bound by the trial court's findings of fact that are supported by evidence in the record. *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993). Under the circumstances present in this case, we conclude that police did not conduct a search. We therefore affirm.

The trial court made the following explicit or implicit findings of fact. On May 1, 1999, Tigard police approached the apartment in response to a call from a woman who reported that five people were in the apartment who were not on the lease, were using cocaine on the premises and refused to leave. The apartment was on the second floor of a complex of apartments. A walkway in front of the apartment was the only way to reach the front door. As the officers approached the apartment on the walkway, they had to pass by a kitchen window that was about a foot from the front door.

Officer Anthony Passadore was one of the police officers who responded to the call. He crouched down as he passed by the window, but his attention was drawn to the window when he saw movement inside the apartment through a v-shaped gap in the Venetian blinds. The gap in the blinds was about three inches wide and at about shoulder height for Passadore, who is six feet tall. The officer testified that the gap in the blinds looked like someone had been looking out of them and had failed to close the gap afterwards. Passadore straightened up and inclined his head to see through the gap while remaining essentially in the place on the walkway where he had been when he saw the movement through the window.

Passadore could see two people inside the kitchen. One man had his back to the window, and defendant was facing it. Passadore observed the man with his back to the window lean forward and heard him sniff loudly. The man then

moved so that Passadore could see that he was holding a plate with a white powdery substance and a credit card on it. Defendant took the plate, scooped some of the white powder up with the credit card, and inhaled it. Based on those observations, Passadore concluded that the men were using cocaine. The officers then knocked on the door of the apartment, announced their presence, entered the apartment, and seized the cocaine.

Defendant moved to suppress the evidence, arguing that police conducted an unlawful warrantless search when they looked through the gap in the blinds.[1] The trial court denied the motion, holding:

"What happened here was [police] are called to the scene because of—from what they are told, the person who has possessory rights to the premises, and has attempted to exclude a bunch of people from those premises, has not been able to do that, and so she has left those premises to get police help to get the people out of her premises and get her back in her premises. There is a clear criminal activity, arguably, going on there, and there is a clear implication of some violence involved, at least the worry about violence * * *.

"So when they see the motion through the blinds—and that is, in effect, the problem of the people inside. The police officers are doing nothing then. They are simply passing through in an appropriate fashion under the circumstances, and they see the motion from inside. That, under the circumstances, gives them, in my mind, sufficient reason to look in to make sure that they are not endangered, that there isn't somebody in there about to shoot them, and that is when, in my mind the being—being in a place that they had a right to be takes over, and whatever they see when they look through that bend to which they have been drawn by the motion that they saw when they were in a place that was appropriate and legal * * *.

---

[1] At the hearing on the motion, the parties agreed that the officers were at a lawful vantage point and that, if it was lawful for officers to look in the window without a warrant, exigent circumstances justified their subsequent entry. The only issue raised was whether looking in the window was an unlawful search. We note that the state did not argue that, because defendant was a trespasser, he had no privacy interest in the premises. We therefore do not address that issue or any other issue on appeal.

"* * * I think the police are, in effect, innocently, we'll say, drawn through the opening, and then they are looking through, and in doing so, I don't think they violated anyone's rights.

"I would also say were it to be dispositive, I would accept the officer's testimony. I haven't got any reason to think he wasn't telling the truth one way or the other regarding whether is was a three-inch bend, whether it was three inches. It was one he described he would be able to look through easily without scrunching up to the window, but simply to be at his level to the opening. Whether it was three inches—in other words, I didn't find him to be trying to make his story stronger. So I am going to deny the motion[.]"

Following the trial court's denial of the motion to suppress, defendant entered a conditional guilty plea pursuant to ORS 135.335(3),[2] reserving the right to appeal the denial of the motion to suppress. Pursuant to the plea, the trial court entered a judgment of conviction of possession of a controlled substance against defendant. On appeal, defendant renews his argument that police conducted an unlawful search when they looked through the gap in the blinds.

The issue that must be resolved is whether the officer's observations through the gap in the blinds invaded a privacy interest protected by Article I, section 9, of the Oregon Constitution. *State v. Campbell*, 306 Or 157, 163, 759 P2d 1040 (1988). A search occurs when government conduct significantly intrudes on a person's privacy. *State v. Wacker*, 317 Or 419, 425, 856 P2d 1029 (1993); *State v. Ainsworth*, 310 Or 613, 616, 801 P2d 749 (1990). One indication of whether police conduct constitutes an impermissible invasion of privacy is whether the actions violate social norms. *State v. Fortmeyer/Palmer*, 178 Or App 485, 489, 37 P3d 223 (2001). However, "not everything that police officers see or hear one do in private quarters requires a search warrant." *State v.*

---

[2] ORS 135.335(3) provides:

"With the consent of the court and the state, a defendant may enter a conditional plea of guilty or no contest reserving, in writing, the right, on appeal from the judgment, to a review of an adverse determination of any specified pretrial motion. A defendant who finally prevails on appeal may withdraw the plea."

*Louis*, 296 Or 57, 61, 672 P2d 708 (1983). An individual can give up his or her right to privacy by engaging in conduct "in otherwise protected areas in such a way that [his or her] acts can plainly be seen or heard outside without any special effort." *Id.* Thus, "[a] police officer's unaided observation, purposive or not, from a lawful vantage point is not a search under Article I, section 9, of the Oregon Constitution." *Ainsworth*, 310 Or at 621.

■　In this case, the parties agree that the police were lawfully on the walkway outside the apartment. However, defendant argues that Passadore violated social norms when he looked in the gap because he inclined his head in order to see through the blinds. He bases his argument on this court's decision in *State v. Gabbard*, 129 Or App 122, 877 P2d 1217, *rev den*, 320 Or 131 (1994). In that case, we held that, where a police officer bent down and peeked through a crack in the siding of a shed about four and one-half feet from the ground, a search occurred. *Id.* at 125, 130. Similarly, in *Fortmeyer/ Palmer*, 178 Or App at 491, we held that a search occurred where, after the defendants had refused to allow police to search their residence, police obtained access to an area that the defendants shared with a neighbor. They then kneeled down and turned their heads at a particular angle to peer through a crack in an otherwise obstructed window. We stated that such conduct, if engaged in by an ordinary citizen, "would be suspicious, uncommon, and unacceptable in our society." *Id.* at 492.

In contrast to the above cases, we held in *State v. Rodriguez-Ganegar*, 186 Or App 530, 538, 63 P3d 1225 (2003), that no search occurred when an officer observed illegal activity from a lawful vantage point after "his attention happened to be drawn * * * by a series of loud noises" through a three-fourths to one-inch vertical gap in the curtains of a motel room window. We reasoned that it took no special effort on the part of the officer when he looked through the window from a lawful vantage point "about three or four inches away from it[.]" *Id.* at 537. The gap in the curtains made the activity inside the motel room "plainly visible to any passerby whose attention might be drawn to the activities inside the room." *Id.* at 537-38.

This case is similar to *Rodriguez-Ganegar*. Here, the police officer observed illegal activity from a lawful vantage point through a three-inch gap in the blinds after his attention was drawn to the interior of the room by movement inside the apartment as he approached the front door. The officers had to pass the kitchen window on the way to the front door. They took no extraordinary efforts to look into the apartment as occurred in *Gabbard* and in *Fortmeyer/Palmer*. Passadore simply inclined his head so he could see through the gap, which was at about his shoulder height. From that position, he was able to observe the men inside from a normal distance without "scrunching up to the window[.]" His conduct did not offend social norms. We do not believe it "suspicious, uncommon, and unacceptable in our society," *Fortmeyer/Palmer*, 178 Or App at 492, for someone going to the front door of a residence to look in the front window after seeing movement inside through the window. Although the blinds were closed, anyone passing on the way to the door could easily see through the gap.

We conclude that under the totality of the circumstances present in this case, the police did not invade defendant's privacy interest. They looked in the window from a lawful vantage point and observed defendant's activities without engaging in any extraordinary effort. Because the conduct by the officers did not constitute a search, the trial court correctly denied defendant's motion to suppress.

Affirmed.