Argued and submitted June 3, 2005; resubmitted en banc December 1, 2005,
affirmed February 22, 2006

## STATE OF OREGON,
*Respondent,*

*v.*

## SHARON DAWN HOWARD,
*Appellant.*

01122854; A121011 (Control)

## STATE OF OREGON,
*Respondent,*

*v.*

## GARY DEAN DAWSON,
*Appellant.*

01122853; A121012
(Cases Consolidated)

129 P3d 792

Patrick M. Ebbett argued the cause for appellants. With him on the brief was Chilton, Ebbett & Rohr, LLC.

Denis M. Vannier, Assistant Attorney General, argued the cause for respondent. With him on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Brewer, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Linder, Wollheim, Schuman, Ortega, and Rosenblum, Judges.

LINDER, J.

Schuman, J., dissenting.

## LINDER, J.

The sole issue in this case is whether police invaded defendants' protected possessory or privacy rights under Article I, section 9, of the Oregon Constitution by searching their garbage after the sanitation collection service collected it and voluntarily turned it over to police. We conclude that the answer is no and that the trial court correctly denied defendants' motions to suppress evidence obtained as a result of the search. We therefore affirm the judgments convicting defendants of manufacturing a controlled substance, ORS 475.992(1), possession of a controlled substance, ORS 475.992(4), and frequenting a place where controlled substances are used, ORS 167.222.

The pertinent facts are straightforward and undisputed. Police obtained information about multiple purchases of iodine—a chemical used in the manufacture of methamphetamine—from a feed store in Sweet Home. The information included the license plate number of a car driven by the person who purchased the iodine. Police traced the car's registration to Sharon Howard, one of the codefendants in this case, and obtained the address of her residence in Sweet Home. As police would later discover, codefendant Gary Dawson also was living at the Sweet Home residence with Howard.

In an effort to obtain information about possible drug activities at the residence, police contacted the sanitation company that collects garbage in the area. The manager of the company agreed to permit police to inspect defendants' garbage on the next scheduled collection day. On that day, the manager followed the garbage collection truck in a pickup truck. Defendants' trash can had been set on the curb and was ready for collection. With a police detective observing, a sanitation employee placed the trash can into the manager's pickup truck, rather than dump the contents into the regular garbage collection truck, and left a replacement can at the curbside. The detective followed the manager, who then drove to a remote location. There, the detective inspected the contents of the can. In the search, the detective discovered several items relating to the possession and manufacture of

controlled substances, along with mail addressed to codefendant Dawson. Two months later, following the same procedure, police conducted a second search of defendants' garbage and discovered several additional items relating to illegal drug activity. Based on the evidence from the two searches, police obtained a warrant to search the Sweet Home residence. In executing the warrant, police found and seized evidence of the use and manufacture of methamphetamine and possession of marijuana.

Before trial, defendants moved to suppress the evidence obtained as a result of the warrantless search of their garbage, arguing that the search violated Article I, section 9, of the Oregon Constitution. More specifically, defendants argued that they retained a protected possessory or privacy interest in the discarded garbage and that the police therefore had to obtain a warrant before inspecting it. In response, the state argued that the garbage was "abandoned" property in which defendants no longer had a protected privacy or possessory interest. The trial court denied the motion to suppress, and defendants were tried and convicted by a jury on all counts. They appeal, challenging the denial of the motion to suppress and renewing the arguments that they made to the trial court.

When a seizure or search is carried out by the police without a warrant, the state must demonstrate by preponderant evidence that the seizure or search did not violate Article I, section 9.[1] *State v. Cook*, 332 Or 601, 608, 34 P3d 156 (2001). The state can meet that burden in either or both of two ways. First, it can establish that the circumstances of the seizure or search fit within an exception to the warrant requirement. *State v. Knox*, 160 Or App 668, 673, 984 P2d 294, *rev den*, 329 Or 527 (1999). Second, the state can show that a defendant had no protected privacy or possessory interest in the property, in which case the examination or

---

[1] Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

confiscation of the property is not considered a search or seizure under Article I, section 9. *State v. Purvis*, 249 Or 404, 410-11, 438 P2d 1002 (1968).

■      We begin by analyzing whether defendants had a possessory interest in their garbage when the sanitation company, after collecting it in the regular course, voluntarily turned it over to police for inspection. On that point, our recent decision in *State v. Galloway*, 198 Or App 585, 109 P3d 383 (2005), is highly instructive. The defendants in *Galloway* had placed their garbage in closed containers in front of their yards for collection by a sanitation company. While the garbage sat in the containers at the curbside awaiting the scheduled collection, police opened the closed garbage cans and searched their contents. We concluded that the searches violated Article I, section 9, reasoning:

> "[D]efendants had arrangements with garbage collection companies that specified where the garbage cans were to be placed for collection and when collection would occur. Defendants abided by those agreements by placing their garbage inside of garbage cans and placing the cans in the locations required for curbside collection.
>
> "Thus, defendants placed their garbage cans and the contents of those cans in a particular place in order to facilitate a limited purpose, *viz.*, pick-up and disposal by a designated collection company. Defendants did not implicitly authorize anyone else to paw through their garbage and view or take items of garbage. Rather, they placed their garbage in cans by the curb with the understanding that the garbage collection company—and only the garbage collection company—would remove the bags from the cans and carry the bags away."

*Galloway*, 198 Or App at 595-96. In other words, by placing "their garbage in closed containers in front of their residences," the defendants manifested "to objectively reasonable third parties that the contents were to be collected only by a designated entity." *Id*. at 598. We therefore concluded that the defendants "retained protected possessory interests in the contents of their garbage cans *until that collection occurred*." *Id*. (emphasis added).

Explicit in our reasoning in *Galloway* is the acknow-ledgment that, once garbage is collected by a sanitation or other refuse company, the analysis changes. At that point, the original "owner" of the garbage relinquishes his or her possessory interest to the company that contracted to collect it. From a possessory standpoint, the garbage belongs to the sanitation company after it is collected. Necessarily, if police then confiscate or inspect the garbage, they do not infringe on any possessory interest of the person who contracted with the sanitation company to take it away and dispose of it however the sanitation company might choose.[2]

Here, unlike in *Galloway*, police did not search defendants' garbage at the curbside before it was collected. Rather, they first contacted the sanitation company. The manager of the company chose to turn the garbage over to police for inspection after the garbage was collected in the regular course of the sanitation company's collection routine. Before the sanitation company collected defendants' garbage, defendants maintained a possessory interest in the contents of their garbage can. But after it was collected, they did not— they had relinquished those interests to the sanitation company.

The remaining question is whether defendants retained a *privacy* interest in the contents of their garbage can, notwithstanding their abandonment of their *possessory* interests in it. On that point, the Supreme Court's decision in *Purvis* is controlling. In *Purvis*, hotel staff reported to police their belief that a hotel guest—the defendant—was using drugs. When police came to investigate, hotel staff voluntar-ily assisted in that effort. At the direction of the hotel man-ager, housekeepers entered the defendant's room, removed the trash from it, and took the trash to an officer, who then searched it. *Purvis*, 249 Or at 405-06. The defendant was criminally charged and, before trial, unsuccessfully moved to

---

[2] The dissent points out that this part of our decision in *Galloway* was *dictum*. 204 Or App at 454-55 (Schuman, J., dissenting). We agree. Although it was *dictum* in *Galloway*, we now adopt it as part of our holding in this case. Significantly, the dissent does not take issue with the correctness of the observation in *Galloway* and our holding that, after garbage is collected in the ordinary course by a company authorized to haul it away and dispose of it, the individual who left it for collection retains no possessory interest in it.

suppress the evidence obtained in the search. The trial court denied the motion, and, on appeal of his conviction, the defendant challenged that denial.

The Supreme Court considered the legality of the search under both the "Fourth Amendment and its counterpart in our own constitution," Article I, section 9. *Id.* at 409. The court concluded that the motion to dismiss was properly denied, holding that a person has no privacy interest in items that he or she discards in a waste basket that are "destined to be thrown away" and that the person has "impliedly authorized to be hauled away." *Id.* at 410-11. In so concluding, the court recognized that the defendant retained a privacy interest in his hotel room and that the housekeepers had to enter that room to obtain the garbage and turn it over to police. The housekeepers, however, were privileged to enter for that purpose. *Id.* at 411. As a result, when the defendant discarded his trash in the room, he impliedly authorized the discarded items to be taken away by the housekeeping staff. *Id.* at 410. That implicit authorization, in turn, terminated his privacy interest in the discarded garbage. *Id.* "Certainly," the court emphasized, the defendant's privacy interest was terminated once the housekeepers removed the trash from the room, at which point it was open to inspection by anyone, including police, if the hotel staff turned it over to them. *Id.*

As in *Purvis*, defendants' garbage in this case was collected by someone whom defendants had authorized to collect it. Indeed, the authorization here was explicit, through the contractual arrangement between defendant Howard and the collection company. In all events, however, the sanitation company acted within its authority when it took defendants' garbage for disposal. Once that garbage was in the collection company's physical possession and control, defendants' privacy interests in the contents of their garbage can were extinguished, as *Purvis* instructs. *A fortiori*, the ensuing police examination of the garbage and confiscation of evidence of defendants' drug activities did not invade a privacy interest protected by Article I, section 9.

The dissent maintains that, for two reasons, "[w]e are free to ignore *Purvis*" in resolving the issue in this case.

204 Or App at 456 (Schuman, J., dissenting). First, the dissent distinguishes *Purvis* on its facts:

> "[T]he police conduct in *Purvis* differed materially from the conduct in the present case. In *Purvis*, the defendant apparently casually discarded the evidence and left it exposed to anybody who happened to be in the room. The garbage in the present case, in contrast, was placed in a closed container with the expectation that it would remain obscured until it was commingled with other garbage and therefore not easily retrieved and identifiable."

*Id.* at 455 (Schuman, J., dissenting).

Assuming, for the sake of argument, that those factual distinctions are accurate,[3] they are beside the point. As we recently explained in a different context, "[o]ur task is not to await the Supreme Court's treatment of other particular factual situations, but to apply the Supreme Court's reasoning to such situations as they arise and to the extent that they do not involve significant distinctions." *Olsen v. Deschutes County*, 204 Or App 7, 20, 127 P3d 655 (2006). Here, none of the facts that the dissent highlights was a factor in the court's reasoning in *Purvis*. Rather, as we have already explained, the court's reasoning was that a person has no privacy interest in items that are "destined to be thrown away" and that the person has "impliedly authorized to be hauled away," and "certainly" that is so once those items have been collected by the

---

[3] They are not necessarily accurate, especially when the record is viewed in the light most favorable to the state, as it must be. For example, although defendants sometimes packaged their garbage in closed opaque bags, they also sometimes put it in open paper bags. In that form, defendants' garbage would have been exposed to the sanitation collector's view as it was dumped out of defendants' curbside can. Also, although defendants stated that they did not expect anyone to go through their garbage, they had no specific contractually based expectation about how their garbage would be handled or disposed of. When defendant Howard—who contracted with the sanitation company for garbage collection—was asked where the garbage "goes particularly," she answered that she did not know. She said only that she believed it goes to "dump sites" and to where "everybody else's garbage is going." She expressly acknowledged that she did not care where the garbage goes; she just wanted someone to come and take it away so that it would be gone. Defendant Dawson—who did not have a contractual relationship with the sanitation company—specifically acknowledged that he had no control over what the sanitation company did with the garbage after collecting it. Of significance, neither defendant Howard nor defendant Dawson considered the garbage to still be theirs once it was collected by the sanitation company. Nor did they believe that they could recover anything they disposed of from the sanitation company.

person authorized to collect them. *Purvis*, 249 Or at 410-11. Given that rationale, the distinctions on which the dissent relies are irrelevant.

The dissent's second reason for departing from *Purvis*'s holding is that, in its view, *Purvis* is "clearly a Fourth Amendment case[.]" 204 Or App at 455 (Schuman, J., dissenting). The dissent apparently considers *Purvis* not to be authoritative because the Supreme Court did not follow the independent state constitutional analysis that it has followed in other search and seizure contexts in the years since *Purvis* was decided. *Id.* at 455-56 (Schuman, J., dissenting).

With respect, we disagree that we are free to ignore *Purvis* on that theory. *Purvis* was explicitly decided under Article I, section 9. The Supreme Court is free to adopt a federal constitutional analysis as the analysis that it uses to interpret a parallel provision in our state constitution if it so chooses, and it sometimes does. *See, e.g., Eugene Sand & Gravel v. City of Eugene*, 276 Or 1007, 1013, 558 P2d 338 (1976), *cert den*, 434 US 876 (1977) (adopting federal test for establishment of religion as the appropriate test to be used under the state constitution as well). Since deciding *Purvis*, the Supreme Court has not overruled it or, for that matter, even disavowed it. To the contrary, in *Cook*, 332 Or at 606, the Supreme Court cited *Purvis* as one of several cases resolved under Article I, section 9. The court then drew guidance from *Purvis*, along with the other cases it cited, to determine the circumstances in which a defendant will be deemed to have relinquished his or her constitutionally protected interest in an article of property. In short, *Purvis* is factually on point, it was decided under Article I, section 9, and it remains authoritative. If *Purvis* is to be revisited, the Supreme Court must do the revisiting.

Finally, worth observing is that the dissent's reliance on later Supreme Court precedent does not aid it. Drawing from *State v. Campbell*, 306 Or 157, 171, 759 P2d 1040 (1988), the dissent would declare categorically that a person has a privacy interest in his or her garbage after it has been collected by someone authorized to take it and dispose of it, because examining a person's garbage so offends the dissent's perception of collective sensibilities about the public's

interest in freedom from government scrutiny. *See* 204 Or App at 450-53 (Schuman, J., dissenting). *Campbell*, however, did not announce a one-size-fits-all test for privacy interests protected under Article I, section 9. As the Supreme Court has cautioned, cases decided both before and after *Campbell* have assessed the existence of a protected privacy interest "in light of the particular context in which the government conduct occurred." *State v. Meredith*, 337 Or 299, 306, 96 P3d 342 (2004).

The context here is meaningfully distinct from *Campbell*, which involved a radio transmitter mounted surreptitiously and without consent on the bumper of a private car so that police could track the car's whereabouts. In other words, *Campbell* involved both (1) a search through technological enhancement and (2) an unlawful physical invasion in the form of an actual trespass to property. This case, in contrast, involves garbage that defendants turned over to the dominion and control of a sanitation company. That sanitation company, in turn, voluntarily permitted police to search the garbage after it was within the sanitation company's possession. Police committed no trespass nor did their search depend on technological enhancement to invade what otherwise would have been private space. *See Meredith*, 337 Or at 306 (distinguishing *Campbell* because it involved a clear form of unlawful invasion—a physical trespass); *State v. Smith*, 327 Or 366, 373 n 5, 963 P2d 642 (1998) (same); *State v. Ainsworth*, 310 Or 613, 618 n 5, 801 P2d 749 (1990) (*Campbell* and other cases concerned with technological enhancement were not relevant to the analysis of what police may examine from a lawful vantage point).[4]

The post-*Purvis* case that most informs the analysis of defendants' protected privacy interest in this context is *State v. Tanner*, 304 Or 312, 745 P2d 757 (1987). In *Tanner*, the defendant entrusted certain effects to a third party under

---

[4] The dissent misunderstands our point in citing these cases. *See* 204 Or App at 451 n 4 (Schuman, J., dissenting). Our point is not that the Supreme Court has strictly limited *Campbell* to contexts involving technological enhancement or a physical trespass. Our point is, instead, that the Supreme Court has declared that context is important in determining the existence of a protected privacy interest, *see Meredith*, 337 Or at 306, and the court has more often distinguished *Campbell* than it has extended it, as the representative cases we cite reveal.

circumstances in which the defendant could reclaim the effects. Police then searched the third party's home unlawfully. The court held that "the entrustment of an effect to another is sufficient to establish a privacy interest that is violated when the effect is discovered *through an unlawful search*." 304 Or at 323 (emphasis added). The court emphasized that, if the third party were to have allowed police access to where the entrusted effects were kept and had permitted police to discover them, then the defendant's interests would not be violated, not because the defendant lacked a privacy interest against the government, but because the third party lawfully controlled access to the effects. *Id.* at 322. The court also observed that, if the "defendant had sold or given away the effects, that might have been a sufficient basis for concluding that defendant no longer had a privacy interest that could be violated by the discovery of the effects." *Id.* at 323.

Both facts that the court in *Tanner* held would or might defeat the defendant's protected privacy interest are present in this case. Here, defendants did not entrust the garbage to the sanitation company under circumstances in which they might reclaim it. It was, after all, garbage; they wanted to be rid of it permanently. The sanitation company hauled it away on those terms. As importantly, defendants turned the garbage over to the sanitation company unconditionally. Under *Tanner*, even *if* defendants retained some privacy interest in the garbage itself or in the place where it was transported or stored, defendant's *protected* privacy interest was not violated if police obtained access to the garbage with the permission of the sanitation company—that is, lawfully *vis-à-vis* the person or entity that possessed it. Even apart from the holding in *Purvis*, which is controlling, *Tanner* would dictate that no *protected* privacy interest of defendants was invaded when police searched the garbage with the consent of the sanitation company that collected it in the ordinary course and that exercised possessory control over it. *See State v. Dowdy*, 117 Or App 414, 419, 844 P2d 263 (1992) (under *Tanner*, the defendant's privacy interests in his personal effects in hotel room were not invaded because police

searched hotel room with consent of hotel manager, who had common authority to permit access to the room).[5]

In sum, under *Galloway*, defendants had no *possessory* interest in the garbage once it was collected by the sanitation company. Under *Purvis*, they had no *privacy* interest at that point either. And under cases decided since *Purvis*, the search by police did not invade any *protected* privacy or possessory interest retained by defendants because the sanitation company, which had possessory control over the garbage, chose to give police access to it. We conclude, therefore, that the warrantless searches of the relinquished garbage were not unreasonable under Article I, section 9, of the Oregon Constitution. The trial court properly denied defendants' motion to suppress.

Affirmed.

**SCHUMAN, J.,** dissenting.

Police, apparently recognizing that they lacked authority to go on defendant Howard's property in order to seize her curbside garbage container, arranged to have her garbage collection service pick up the container and immediately turn it over to them.[1] The officers then took the container away, extracted its contents, and inspected them. The

---

[5] The dissent discounts *Tanner* because it was decided one year before *Campbell* and because its analysis entailed—to quote the dissent's words "musings about hypothetical situations." 204 Or App at 451 n 4 (Schuman, J., dissenting). But *Tanner* is hardly a dead letter. Cases from our court and the Supreme Court alike that rely on *Tanner* and aspects of its analysis that the dissent considers mere "musings" are too numerous for citation. *Dowdy* is one such case and is on point. Moreover, the principle that we derive from *Tanner* is neither novel nor unique to *Tanner*. It is a recognition, in a different context, of the settled legal principle that a person who exercises joint possession and control over a space and the effects in it may validly permit police to enter that space and discover those effects, even though other individuals also have possessory and privacy interests in the same space and effects. *See, e.g., State v. Weaver*, 319 Or 212, 219, 874 P2d 1322 (1994) (consent exception to the warrant requirement applies if someone with authority to do so voluntarily gave police consent to search and police complied with any limitations on the scope of the consent).

[1] The police were correct: After this case was briefed, we held that government officials may not seize curbside garbage cans without a warrant or circumstances establishing an exception to the warrant requirement. *State v. Galloway*, 198 Or App 585, 598, 109 P3d 383 (2005). Defendants do not argue that police are also prohibited from circumventing that constitutional limitation on their authority by recruiting private citizens to conduct the seizure for them. That remains an open question under the Oregon Constitution.

state contended at trial that the seizure of the container, extraction of its contents, and inspection did not amount to a violation of defendant's possessory or privacy interests and, for that reason, that the police conduct was not subject to any of the limitations imposed by Article I, section 9, of the Oregon Constitution. The state, in other words, argued below (and continues to argue on appeal) that the provision of the Oregon Constitution guaranteeing "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search" leaves government officials free to have people's garbage seized from their property[2]— without telling them, without a warrant, and without any reason to believe that they have done anything wrong—and then to harvest from the garbage whatever personal information it may yield. The trial court agreed. So does the majority. I do not.[3]

Under a well-settled and frequently repeated precept first announced in *State v. Campbell*, 306 Or 157, 171, 759 P2d 1040 (1988), government officials (usually but not always police officers) interfere with a person's privacy so as to implicate constitutional limitations when they engage in a "practice," which, "if engaged in wholly at the discretion of the government, will significantly impair 'the people's' freedom from scrutiny[.]" *Accord State v. Nagel*, 320 Or 24, 29, 880 P2d 451 (1994); *State v. Wacker*, 317 Or 419, 425, 856 P2d 1029 (1993); *State v. Ainsworth*, 310 Or 613, 617, 801 P2d 749 (1990); *State v. Dixson / Digby*, 307 Or 195, 211, 766 P2d 1015 (1988); *State v. Rodriguez-Ganegar*, 186 Or App 530, 534, 63 P3d 1225, *rev den*, 335 Or 578 (2003); *State v. Fortmeyer / Palmer*, 178 Or App 485, 488-89, 37 P3d 223 (2001); *State v.*

---

[2] Although the trial court found that the garbage can was taken from an area that was "public," the court explained that it meant only that it was open to the public. Howard's uncontradicted testimony was that the garbage can was on her property.

[3] The garbage seizure and inspection occurred during a police investigation into criminal conduct, and the issue of the inspection's legality arose in the adjudication of a motion to suppress evidence. Those facts are not relevant to the underlying legal issue, which is whether "the people" have a possessory or privacy interest in the contents of their curbside garbage containers. More importantly, stating the facts so as to abstract the generally applicable legal issue from the criminal context in which it is embedded allows the discussion to focus on the fact that Article I, section 9, is a fundamental guarantee to "the people" that government will not unreasonably invade their privacy.

*Larson*, 159 Or App 34, 40, 977 P2d 1175, *rev den*, 329 Or 318 (1999).

Later cases have clarified that the "practice" is not evaluated in the abstract, but with respect to the context in which it occurs. *State v. Meredith*, 337 Or 299, 307, 96 P3d 342 (2004). Thus, attaching a "beeper" to a private citizen's car is a search, whereas attaching one to a public employee's publicly owned car is not. *Id.*[4] Emphatically, however, whether the act implicates protected privacy interests can never depend on whether the person searched is a criminal suspect: Article I, section 9, protects "the people," and our determination whether an act is a "search" must always be made with the awareness that it is all Oregonians' freedom from unwanted government scrutiny that is at stake—even though we are called upon to make that determination in a context where the practical effect of our decision could be that incriminating evidence of a criminal act will be suppressed and, because the "constable has blundered," the criminal will go free. *People v. Defore*, 242 NY 13, 21, 150 NE 585, 587, *cert den*, 270 US 657 (1926) (Cardozo, J.). As Justice Harlan famously noted in the context of electronic eavesdropping,

"[s]ince it is the task of the law to form and project, as well as mirror and reflect, we should not, as judges, merely recite the expectations and risks without examining the desirability of saddling them upon *society*. The critical question, therefore, is whether under our system of government, as reflected in the Constitution, we should impose on *our citizens* the risks of the electronic listener or observer without at least the protection of a warrant requirement."

*United States v. White*, 401 US 745, 786, 91 S Ct 1122, 28 L Ed 2d 453 (1971) (Harlan, J., dissenting) (emphasis added).

---

[4] The majority argues that the *Campbell* rule does not apply here because this case does not involve a police trespass or a technological enhancement. 204 Or App at 447. However, the Supreme Court applied the rule in *State v. Nagel*, 320 Or 24, 29, 880 P2d 451 (1994) (field sobriety test is search), which involved neither a trespass nor a technological enhancement. Similarly, we applied the rule in *State v. Fortmeyer / Palmer*, 178 Or App 485, 491-92, 37 P3d 223 (2001), to hold that a police officer in a public area who used his naked eye to peer into a home conducted a search. The majority also notes that I do not discuss *State v. Tanner*, 304 Or 312, 745 P2d 757 (1987). That case was decided before *Campbell*, and its musings about hypothetical situations cannot supersede *Campbell's* later and more definitive statement.

Thus, the inquiry in the present case is this: Did the police do something that, if they could do it in similar circumstances whenever they wanted, would diminish the freedom from unwanted government scrutiny to which an Oregonian is entitled? In less abstract (but no less relevant) terms: If police officers (or tax collectors or OR-OSHA inspectors or SAIF investigators), without your knowledge and without cause to believe that you had done anything wrong, had your garbage collectors give them your curbside container immediately after pickup, and then the officers took the container to their office, dumped the contents out on the floor, and went through them with the proverbial fine-toothed comb, in the process discovering your social security number, your bank account numbers, your credit card account numbers, your diet, where you shop, what you buy, what medications you take (birth control pills? Viagra? Rogaine? Prozac?), what cosmetics you use, what congenital diseases your DNA might disclose, what periodicals you read, what the discarded drafts of your reports or correspondence say, whom you telephone, how much alcohol you drink, whether or not you threw away that atrocious necktie Aunt Sally gave you for your birthday, and other details of your personal and professional life—in that situation, would *you* feel that *your* privacy had been violated? That is the question, and the answer can only be yes.

Put another way, if the state's rule becomes law, then—as the state itself acknowledges in its brief to this court—people who do not want to give government officials unchecked authority to go through their garbage and discover intimate details of their personal and professional lives are left with four choices: They can haul their own garbage to the dump; they can try to negotiate a side agreement with their scavenger service; they can try systematically to render their refuse incapable of revealing personal information (although that might be difficult with used tampons, which is what police inspected and analyzed in *State v. Galloway*, 198 Or App 585, 589, 109 P3d 383 (2005)); or they can trust government officials not to avail themselves of all the power we will have conferred on them. I believe that imposing one or another of those options on the people of Oregon would

unconscionably burden their ability to avoid loss of freedom from unwanted scrutiny.[5]

The state's argument that people can take steps to avoid having their garbage officially scrutinized and inventoried might also be made with respect to, for example, outgoing parcels that they leave on their doorstep for a UPS or FedEx truck to pick up. As the trial court noted, "[w]hen garbage is delivered to the curbside, common sense dictates that

[5] Those who might take comfort in the belief that garbage searches happen only rarely and only to bad people should note that, in the present case, the officer who recruited Howard's garbage collector conceded that he did not believe that he had probable cause to suspect that Howard had committed a crime; rather, he conducted the search after learning that Howard "at least twice during the past several months" had purchased unusual quantities of iodine, which is not only a precursor ingredient of methamphetamine but also an item with obvious innocent uses (as are, for example, paper coffee filters, another item that, according to the officer, is frequently purchased by methamphetamine manufacturers). Further, as the following colloquy demonstrates, the search of Howard's garbage was one instance of what is apparently a common practice:

"Q [by the deputy district attorney]:  And when you did look through the garbage can what kinds of things were you looking for?

"A [by Detective Welch]:  Well, since I work in narcotics I look for any—anything that could possibly be rela—narcotic related, written notes of drug transfers perhaps, sales receipts from stores that would indicate items that were purchased. In some stores there's—you have little discount cards that when you run it through to purchase things that name will appear on the receipt in some stores. I look for plastic baggies or any type of container that might have contained a controlled substance, and in some cases I'll even field test those items to see if in fact it is either yes or no. I look for precursor chemicals that can be purchased at any local store that can be used to manufacture methamphetamine. In some cases—obviously plants. I find marijuana stems in garbages that I've obtained through the same way, and I look for any evidence of narcotic crimes.

"Q:  And in addition to that do you look for evidence that can help you establish (inaudible) are?

"A:  Yes. I occasionally come across mail addressed to that actual house, and in some cases addressed to even other homes, which shows usually the address and the name of the person that it's addressed to at that house."

Thus, one may attract the scrutiny of government officials by making an occasional bulk purchase of iodine, coffee filters, Heet Fuel, Benadryl, isopropyl alcohol, wooden matches, or baggies (all items the officer swore were associated with manufacturing and distributing methamphetamine). One who has done so may or may not have had his or her garbage searched, and, during that search, the searchers may have found, inspected, and retained checks, papers, documents, mail, envelopes, letters, receipts, utility and telephone bills, handwritten notes and records, phone numbers, credit card numbers, and bank account numbers (all items that the officer either seized or had authority to seize if he found them).

it is with the intent that it be taken to a landfill or garbage dump." So too when a parcel is left for the carrier to pick up and deliver; that act of faith is performed with the intent that the parcel be taken to a recipient. In both situations, a person deposits a closed item in a publicly accessible place with confidence that a particular person or entity will pick it up and deliver it to a destination. Like the sanitation company, the parcel delivery service is an intermediary and a carrier. Prevailing social norms give us confidence that the carrier will not open the item or divert it to somebody who will. Although a prudent person might well deposit parcels only in a secure collection box or a hand-to-hand transaction, or, for similar reasons, shred or haul his or her own trash, social norms make that prudence optional. If inspections or diversions were to become commonplace and unregulated, "the people" would have suffered a significant loss of their freedom from unwanted scrutiny.

The majority frames the issue in this case as "whether police invaded defendants' protected possessory or privacy rights under Article I, section 9, of the Oregon Constitution by searching their garbage after the sanitation collection service collected it and voluntarily turned it over to police." 204 Or App at 440. It then relies on *dictum* in *Galloway* to demonstrate that defendants had no possessory interest in their garbage and on *State v. Purvis*, 249 Or 404, 438 P2d 1002 (1968), to demonstrate that defendants had no privacy interest.

Neither of those cases compels the majority's conclusions. The *Galloway dictum* is not controlling because, in that case, we did not reach the dispositive question here; *Galloway* implies that a person has no *possessory* interest in refuse after it is picked up, but the case does not address the question whether people might retain a *privacy* interest. Generally, government interference with a person's possessory interest in property constitutes a seizure, not a search. *State v. Owens,* 302 Or 196, 207, 729 P2d 524 (1986). A person who loses his or her possessory interest in a closed container nonetheless maintains a privacy interest in the contents of the container thereafter unless the container "announce[s its] contents," *id.* at 206, or the same authority that authorized the seizure also authorized a search, *see*

*State v. Munro*, 339 Or 545, 552, 124 P3d 1221 (2005). Neither of those exceptions applies here.[6] Thus, even if defendants lost their possessory interest in the garbage when the collectors took it, as *Galloway* implies, that does not mean that they also lost their privacy interest.

To demonstrate that defendants lost their privacy interest, the majority relies on *Purvis*. In that case, police recruited hotel housekeepers to collect trash from the defendant's room and turn it over to them. The housekeepers found and turned over a marijuana cigarette butt that the defendant had left on the floor. The Supreme Court held that, in those circumstances, the police did not violate the Fourth Amendment. 249 Or at 411. *Purvis* does not apply to the present case for two reasons. First, the police conduct in *Purvis* differed materially from the conduct in the present case. In *Purvis*, the defendant apparently casually discarded the evidence and left it exposed to anybody who happened to be in the room. The garbage in the present case, in contrast, was placed in a closed container with the expectation that it would remain obscured until it was commingled with other garbage and therefore not easily retrieved and identifiable. *Purvis* would be relevant, in other words, if police had seized and inspected loose trash that defendants had strewn about their lawn.

Second, *Purvis* is clearly a Fourth Amendment case: there is only one passing reference to the state constitution ("the Fourth Amendment and its counterpart in our own constitution," *id.* at 409), and that reference occurs in the context of a statement about what hypothetically would be unconstitutional in a different case. All of the cases cited in support of the court's reasoning are federal cases. Even the court's incidental discussion of the exclusionary rule, *id.* at 409 n 2, indicates that the rule has a deterrent rationale and not a remedial one—an observation that is true of the Fourth Amendment exclusionary rule but not the Article I, section 9,

---

[6] The state's assertion that defendants' garbage container lawfully could be opened because it "announced" that it contained garbage makes as much sense as arguing that a seized briefcase can be opened because it announces that it contains papers or that a seized suitcase can be opened because it announces that it contains things people take when they travel. Unless the exception is to swallow the rule, the "announcement" must be a good deal more specific.

exclusionary rule. *State v. McMurphy*, 291 Or 782, 785, 635 P2d 372 (1981). "[T]here is no presumption that interpretations of the Fourth Amendment by the Supreme Court of the United States are correct interpretations of Article I, section 9." *Campbell*, 306 Or at 164 n 7. In fact, the Fourth Amendment analysis of whether police conduct amounts to a violation of a person's privacy differs significantly from the analysis under Article I, section 9, *id.* at 170-71, and whether or not the kind of police conduct that occurred in *Purvis* implicates Article I, section 9, is an open question. We are free to ignore *Purvis* in resolving that question, and we should do so. *See State v. Caraher*, 293 Or 741, 750-52, 653 P2d 942 (1982) (court's Fourth Amendment precedents on an issue irrelevant in deciding same issue under Article I, section 9).

In sum, I am unwilling to endorse a rule under which government authorities—for good reason, bad reason, or no reason at all—are free, through the expedient of recruited civilians, surreptitiously to arrange for the seizure and subsequent inspection and analysis of the contents of garbage containers that people leave at curbside for pickup and delivery to the dump or recycling facility. Such a rule would result in an unwarranted and significant reduction in the people's freedom from unwanted scrutiny. For that reason, I conclude that officials may not engage in such conduct without a warrant or circumstances justifying an exception to the warrant requirement. It bears repeating that if police have good reason to believe that the garbage will yield the fruits, evidence, or instrumentalities of crime, then they can obtain lawful authority to search by using the procedure that the framers established to ensure that the people would be secure against unreasonable searches: they can obtain a warrant from a neutral and detached magistrate. Police in this case had no warrant, and the state does not argue that some exception to the warrant requirement applied. The search was unlawful, and the evidence derived from it should have been suppressed. I therefore dissent.

Armstrong and Wollheim, JJ., join in this dissent.