NAKAMOTO, J.
**752 Article I, section 9, of the Oregon Constitution provides, in part, that "[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]" These consolidated cases concern whether the warrantless search of defendants' garbage bin violated a protected interest of defendants under Article I, section 9.
Police officers discovered incriminating drug-related evidence in defendants' garbage by having a sanitation company manager specially pick up defendants' garbage bin on trash pick-up day, transport it to the sanitation company's facilities, and turn it over to the officers, who then searched the bin. After the trial court denied their motions to suppress that evidence, defendants were convicted on drug-related charges. The Court of Appeals affirmed those convictions, concluding that, although defendants retained protected possessory and privacy interests in the garbage while their bin rested at the curb, the police did not violate their interests by taking possession of the bin and searching its contents, because defendants had lost *187 their interests when the sanitation company picked up their garbage bin.
On review, we hold that defendants retained protected privacy interests in their garbage under Article I, section 9, which the police invaded when they searched defendants' garbage bin without a warrant. Accordingly, the trial court erred by denying defendants' motions to suppress evidence, and we reverse the decision of the Court of Appeals and the judgments of the circuit court and remand for further proceedings before the circuit court.
I. FACTS AND PROCEDURAL HISTORY
We begin with the facts concerning the retrieval and search of defendants' garbage bin, which are not disputed. While defendants lived together in Lebanon, Oregon, local police received information about possible drug activity at their house and decided to investigate. Lebanon Police Department Detective McCubbins contacted the sanitation company servicing the house, Republic Services. Republic is a private company that has a franchise agreement with the **753 City of Lebanon to pick up and haul garbage from private residences. Neither defendant had a separate written agreement with Republic.
McCubbins asked Republic to collect the contents of defendants' garbage bin separately from the other private residences that Republic served so that defendants' garbage could be searched by police officers. A manager for Republic agreed to cooperate, obtaining defendants' garbage for the police before the regular garbage truck arrived at the house:
"On the day that defendants' garbage was usually picked up, the police parked down the street to observe Republic's collection of defendants' trash. The police arrived at 7:00 a.m. and noticed that defendants' garbage cart had already been placed by the sidewalk. On that morning, a manager for Republic drove to defendants' residence in a white pickup truck ahead of the larger mechanical sanitation truck that would normally collect defendants' garbage. The manager arrived outside defendants' residence around 8:00 or 9:00 a.m. The manager timed his drive to make sure that he showed up before the company's larger mechanical truck emptied the cart. The manager grabbed defendants' cart and placed it in his company pickup truck. The manager then provided defendants with an empty replacement cart from the back of his truck."
State v. Lien , 283 Or. App. 334, 337, 387 P.3d 489 (2017).
Republic's manager then gave defendants' garbage bin to the police: "The manager drove defendants' bin and garbage to a Republic company lot where Republic stored its extra garbage carts. The manager then handed control of the cart to the police, who searched it and found, among other things, evidence of illegal drugs, including drug bindles." Id. Using that evidence, the police sought and obtained a warrant to search the home.
Defendants were both subsequently charged with a variety of drug-related offenses. Before trial, both moved to suppress the evidence discovered in their garbage bin, arguing that the warrantless search, not otherwise encompassed by any exception to the warrant requirement, had violated their rights against unreasonable search or seizure under Article I, section 9.
**754 At the hearing on defendants' motions to suppress, McCubbins testified for the state and described how the police had obtained defendants' garbage bin and the chain of custody of the bin and its contents. McCubbins acknowledged that defendants' garbage bin was handled "not in the normal manner" but, rather, "in a special manner" at his request.
Defendants called defendant Lien and Republic's manager as witnesses. They testified concerning Republic's residential garbage service in Lebanon and the sanitation company's usual practices when picking up that garbage. Lien testified that she had lived at her residence for approximately five years and that Republic was the company that picked up her household garbage. She testified that some of that garbage was private in nature and that she had expected the garbage in defendants' bin "to be mixed with *188 other people's garbage and go out to the landfill." She explained that, while she had no written agreement with Republic, she nevertheless had expected that the sanitation company would process defendants' garbage in the same way that it processed everyone else's garbage, that is, without anyone going through it before it was commingled and taken to the landfill.
Republic's manager described the usual process of residential garbage collection and disposal: The garbage bins have lids, and customers must place their bins near the street within reach of the mechanical arm on the garbage truck. The company uses a large, automated side-load garbage truck to grab the bins and dump their contents into the opening at the top of the truck. The driver typically does not have to get out of the truck and does not see the contents of the individual garbage bins. A truck can hold the garbage of 350 to 400 households, and, once the truck is full, the driver takes it directly to the landfill and dumps the load of garbage out.
Republic's manager also testified about agreements in place regarding Republic's residential services in Lebanon. He testified that Republic has a franchise agreement with the city to provide garbage service for city residents and that residents had no choice about which company collected their garbage. The sanitation company's franchise **755 agreement did not have a provision stating that it could provide a resident's garbage to law enforcement. Republic did not have a written agreement with its residential customers, nor did it tell customers that it may provide garbage to law enforcement officers at their request. The manager agreed that it was reasonable for Republic's customers to expect that their garbage would be picked up in the ordinary manner, that is, that the lid on the garbage bin would be closed and the bin then emptied into the mechanized garbage truck without the driver getting out and looking into the bin. He also testified that he collected defendants' garbage bin because the police asked him to do that, but he would not collect garbage from a customer for a private citizen because that would "violate the customer's privacy."
The trial court credited the witnesses' testimony. Its findings included the following: "Defendants placed the garbage can at the curb," and "they believed that some of its contents were personal or private in nature." "No one provided any notice to defendants that their garbage was subject to search or examination." "Republic [S]ervices will bring customer's garbage to the police when requested but will not deliver garbage collected from defendants to anyone else." "Ordinarily when the garbage is picked up by Republic Services it is dumped at the Coffin Butte landfill," and "a single garbage truck holds the refuse of 350-400 households." "Republic's trucks are highly mechanized. In most instances the driver never touches the garbage cans-a mechanical arm picks up the cans and empties them into the truck. No employee ordinarily sees the garbage content."
The trial court nevertheless denied defendants' motions to suppress. The trial court first concluded that Republic's manager, who had picked up and delivered defendant's garbage to the police, had "acted exclusively at the request and direction of the police" and "was acting as an agent for the state." It followed, the trial court continued, that the manager's seizure of defendants' garbage constituted state action. The trial court nevertheless concluded that defendants already had abandoned their garbage, along with any "reasonable expectation they would ever see their garbage again or have access to it," before the garbage had been picked up. The court concluded that, despite **756 defendants' subjective expectation of privacy, they retained no privacy interest in property that they had abandoned.
After the trial court denied defendants' motions to suppress, defendants agreed to enter conditional guilty or no-contest pleas to some of the charges. See ORS 135.335(3) (providing that criminal defendants may, with the court's consent, enter conditional pleas of guilty or no contest while reserving the right to appeal adverse determinations of specified pretrial motions; defendants who prevail on appeal may withdraw original pleas). Defendant Lien conditionally pleaded guilty to one count of unlawful delivery of *189 heroin, ORS 475.850, and no contest to one count of unlawful delivery of methamphetamine, ORS 475.890. Defendant Wilverding conditionally pleaded guilty to one count of unlawful delivery of methamphetamine, ORS 475.890. The remaining charges against both defendants were dismissed.
Following the entry of judgments of conviction below, defendants appealed, arguing to the Court of Appeals that the trial court had erred in denying their motions to suppress evidence derived from the warrantless seizure and search of their garbage bin. Defendants asserted that
"[b]y asking the garbage company manager to collect defendants' garbage ahead of the regularly scheduled time and keep it separate for searching, the police enlisted the garbage company manager as a police agent. Thus, what occurred here is legally indistinguishable from the police themselves removing defendants' garbage from the curb, replacing it with an empty cart, and searching it . That is impermissible."
(Emphasis added.) Defendants acknowledged that this court's decision in State v. Howard/Dawson , 342 Or. 635, 157 P.3d 1189 (2007) (where police went through the defendants' garbage after the sanitation company agreed to deliver it), appeared-at least on its face-to control the outcome of their appeal. Defendants nevertheless contended that Howard/Dawson should be reexamined as either distinguishable in this instance or wrongly decided, arguing in accordance with Farmers Insurance v. Mowry, 350 Or. 686, 698, 261 P.3d 1 (2011), that the factual context for the decision in Howard/Dawson regarding the relinquishment of **757 constitutionally protected interests in garbage was different than in this case.
The Court of Appeals, however, was not persuaded that Howard/Dawson was meaningfully different from this case, either factually or in the applicable legal analysis. The court concluded that defendants' possessory rights in their garbage-like those of the defendants in Howard/Dawson -were deemed to have been lost once the garbage was retrieved by the sanitation company on its regularly-scheduled pickup day. Lien , 283 Or. App. at 340-42, 387 P.3d 489. With respect to defendants' privacy interests, the Court of Appeals noted that the Howard/Dawson defendants had raised similar privacy-based concerns before this court, which the court had rejected based on the rationale articulated in State v. Purvis , 249 Or. 404, 410-11, 438 P.2d 1002 (1968), that a person retains no constitutionally protected privacy interest in abandoned property. Lien , 283 Or. App. at 343, 387 P.3d 489. The Court of Appeals held that the trial court had properly denied defendants' motions to suppress and affirmed the judgments below. Id . In reaching that conclusion, however, the Court of Appeals did not discuss defendants' agency-related arguments concerning the role of Republic's manager as a police agent. We subsequently allowed and consolidated defendants' requests for review.
II. ANALYSIS
A. The Issue on Review
Defendants argue that they had protected possessory and privacy interests in their garbage while their closed garbage bin sat at the curb. Cf. State v. Galloway , 198 Or. App. 585, 109 P.3d 383 (2005) (holding that the defendants retained possessory interests in contents of their closed garbage bins at curbside for collection and that they had not abandoned protected interests in garbage that the police had collected). The state does not engage with that argument and assumes, arguendo , that defendants had such interests.[1] The state then proceeds directly to the pivot point **758 for the parties: whether defendants retained either their possessory or privacy interests once the sanitation company manager-acting at the behest of, and as an agent for, the police-specially picked up the bin and transferred it to the waiting police officers for their inspection. *190 On that issue, the parties respectively take "all" or "nothing" positions. Defendants argue that they retained both possessory and privacy interests in their garbage bin and its contents, and that those interests were violated when Republic's manager, acting in his role as an agent of the police, picked up their garbage bin and delivered it to the police. Thus, they argue, the police controlled the taking and delivery of their garbage bin, as well as the ensuing search of their garbage, all without a warrant and in violation of their rights under Article I, section 9.
In contrast, the state contends that, although Republic's manager was in fact an agent of the police, this court's decisions in Purvis and Howard/Dawson stand for the proposition that individuals effectively abandon possessory and privacy interests in their curbside garbage once a sanitation company takes possession of it. Accordingly, in the state's view, by the time Republic's manager delivered defendants' garbage bin to the police, defendants had no constitutionally protected interests in their garbage. Thus, the state argues, the police were free to inspect defendants' garbage and did not violate Article I, section 9.
In keeping with their respective legal positions, the parties initially address whether the police, acting through the sanitation company manager, seized defendants' garbage from the curb in violation of their protected possessory interests in that property. We choose not to decide that issue.
Instead, we decide the other issue that the parties present: whether, after Republic's manager delivered defendants' garbage bin to the police, the police invaded defendants' privacy interests by searching defendants' garbage without a warrant, in violation of Article I, section 9. On that issue, the state bears the burden of establishing that the search "did not violate a protected interest of the defendant." State v. Tucker , 330 Or. 85, 89, 997 P.2d 182 (2000)
**759 (emphasis in original); accord. ORS 133.693(4) ("Where the motion to suppress challenges evidence seized as the result of a warrantless search, the burden of proving by a preponderance of the evidence the validity of the search is on the prosecution.").
Ultimately, whether the police searched defendants' garbage bin and their garbage without a warrant in violation of their rights under Article I, section 9, turns on whether defendants had constitutionally protected privacy interests in the property. See State v. Owens , 302 Or. 196, 206, 729 P.2d 524 (1986) (" Article I, section 9, protects privacy and possessory interests."). We first address, and agree with, defendants' contention that they had privacy interests in their curbside garbage, before Republic's manager arrived. We then discuss the legal underpinnings of the conclusion that the trial court, the Court of Appeals, and the parties all reached: The sanitation company manager was a police agent when he took and delivered defendants' garbage bin to the police. Finally, we address whether-as defendants assert-the role of the manager as a police agent is determinative of whether defendants retained their privacy interests in their garbage when the police searched it, or whether-as the state asserts-this court's conclusions on abandonment of privacy interests in Purvis and Howard/Dawson are applicable to, and retain their viability in, the circumstances that this case presents.
B. Privacy Rights
Among other rights, Article I, section 9, grants "the people" the right to be "secure * * * against unreasonable search" of their "effects." Thus, Article I, section 9, protects people by forbidding "certain acts of the government." State v. Campbell , 306 Or. 157, 166, 759 P.2d 1040 (1988) (emphasis in original). For purposes of Article I, section 9, a "search" occurs when "governmental action invades 'a protected privacy interest.' " State v. Newcomb , 359 Or. 756, 764, 375 P.3d 434 (2016) (quoting State v. Wacker , 317 Or. 419, 426, 856 P.2d 1029 (1993) ).
In Oregon, the right to privacy-the individual freedom from government scrutiny-protected by Article I, section 9, is not defined by private property or contractual **760 rights, although such rights may inform the analysis in a given case. Rather, this court has repeatedly explained that the right to privacy protected by Article I, section 9, *191 "is the freedom from scrutiny as 'determined by social and legal norms of behavior , such as trespass laws and conventions against eavesdropping.' " Newcomb , 359 Or. at 764, 375 P.3d 434 (quoting Campbell , 306 Or. at 170, 759 P.2d 1040 ) (emphasis added); see also State v. Smith , 327 Or. 366, 372, 963 P.2d 642 (1998) (reaffirming the court's "traditional construction of Article I, section 9, as protecting privacy interests , i.e. , the individual's interest in freedom from certain forms of governmental scrutiny") (emphasis in original).[2] This court also has stated that the fundamental question underlying an Article I, section 9, search case is whether the government's conduct, "if engaged in wholly at the discretion of the government, will significantly impair 'the people's' freedom from scrutiny, for the protection of that freedom is the principle that underlies the prohibition on 'unreasonable searches' set forth in Article I, section 9." Campbell , 306 Or. at 171, 759 P.2d 1040. In other words, this court has recognized, first, that privacy-freedom from government scrutiny-is a fundamental principle and value protected by Article I, section 9 and, second, that privacy is grounded in particular social contexts.
Accordingly, we determine whether defendants in this case had a protected privacy interest by first considering general social norms of behavior. Here, the relevant actors are the sanitation company manager, who, as a police agent, procured defendants' garbage bin and gave it to the police; defendants, who put out their opaque and closed garbage bin for trash collection, expecting that the sanitation company with an exclusive franchise in the city,[3] would pick up their garbage, commingle it with the garbage of hundreds of other households on the garbage truck route, and take it to the landfill; and police officers, who arranged for the taking of the garbage and who searched it. In our view, **761 under those circumstances, most Oregonians would consider their garbage to be private and deem it highly improper for others-curious neighbors, ex-spouses, employers, opponents in a lawsuit, journalists, and government officials, to name a few-to take away their garbage bin and scrutinize its contents. In this case, the sanitation company's manager acknowledged that norm: He would not collect garbage from a customer at the request of a private citizen because that would "violate the customer's privacy."
Indeed, defendants make exactly that point, suggesting that most Oregonians would be outraged were their garbage subject to such examination and citing as support an article first published on December 23, 2002, in the Portland publication Willamette Week . The article catalogued items that its reporters had found by collecting the curbside garbage or recycling of three government officials in Portland then serving in law enforcement roles: the city's police chief, the mayor and commissioner of police, and the Multnomah County District Attorney. The reporters described what they had done as a "frontal assault" on privacy and reported some of the officials' angry reactions to having their personal refuse removed from curbside and publicly examined, including the mayor's statement that she considered "Willamette Week's actions in this matter to be potentially illegal and absolutely unscrupulous and reprehensible." See Chris Lydgate & Nick Budnick, Rubbish! , Willamette Week (December 11, 2017), http://www.wweek.com/portland/article-1616-rubbish.html-2 (last accessed May 1, 2019).
It is not hard to understand why people would want to keep their garbage private and would respond with outrage to such an invasion. As the New Jersey Supreme Court explained, "[c]lues to people's most private traits and affairs can be found in their garbage," and so it is common knowledge that most people are interested in keeping their garbage private. State v. Hempele , 120 N.J. 182, 201, 576 A.2d 793 (1990). In his dissenting *192 opinion in California v. Greenwood , 486 U.S. 35, 50, 108 S. Ct. 1625, 100 L.Ed. 2d 30 (1988), Justice Brennan wrote:
"A single bag of trash testifies eloquently to the eating, reading, and recreational habits of the person who produced it. A search of trash, like a search of the bedroom, **762 can relate intimate details about sexual practices, health, and personal hygiene. Like rifling through desk drawers or intercepting phone calls, rummaging through trash can divulge the target's financial and professional status, political affiliations and inclinations, private thoughts, personal relationships, and romantic interests."
That description aptly illustrates the kinds of items routinely placed in garbage containers that people would consider to be private and why. Moreover, it supports the existence of a social norm of privacy concerning residential garbage placed in closed bins and put out at the curb for collection by the sanitation company. See also Jonathan Simon, Katz at Forty : A Sociological Jurisprudence Whose Time Has Come , 41 U.C. Davis L. Rev. 935, 962 (2007) (describing development of opaque plastic garbage bags in the 1960s and their residential use for household waste beginning in the 1970s as suggesting "the extraordinarily high value middle class Americans placed on hygiene and privacy").
In addition to that social norm of privacy concerning residential garbage, legal norms concerning personal privacy support recognition of a protected privacy interest in the contents of closed, opaque residential garbage bins placed at curbside for collection. The common law, as well as other sources, such as statutes, administrative rules, and local ordinances, are informative concerning existing legal norms of behavior. The common law is most relevant in this case.
Oregon courts have long recognized that the people of this state have a freestanding right of privacy. As this court explained over 75 years ago with regard to that right,
"we deem it unnecessary to search for a right of property, or a contract, or a relation of confidence. The question is whether a right of privacy, distinct and of itself and not incidental to some other long recognized right, is to be accepted by the courts and a violation of the right held actionable."
Hinish v. Meier & Frank Co. , 166 Or. 482, 502-03, 113 P.2d 438 (1941).
The court in Hinish concluded that "the needs of the society in which we live" counseled in favor of recognizing a cause of action grounded in a right of privacy for **763 the defendants' appropriation of the plaintiff's name. Id. at 503, 113 P.2d 438. The court reasoned that (1) advances in technology-including the leading media of the day, such as photographs, radio, and movies-would increase the potential for invasions of privacy and (2) a "decision against the right of privacy would be nothing less than an invitation to those so inclined who control these instrumentalities * * * to put them to base uses, with complete immunity, and without regard to the hurt done to the sensibilities of individuals whose private affairs might be exploited, whether out of malice or for selfish purposes." Id. at 503-04, 113 P.2d 438.
Oregonians may vindicate their legally protected interests in privacy by bringing a common law cause of action against the tortfeasor who invades those interests. In McLain v. Boise Cascade Corp. , 271 Or. 549, 554, 533 P.2d 343 (1975), the court described the general rule permitting recovery for invading someone's seclusion-a species of tortious violation of privacy-by reference to the Restatement (Second) of Torts section 652B (1961), which provided:
"One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another, or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable man."[4]
This court later explained that the tort protecting one's seclusion and private affairs "protects the right of a plaintiff to be let alone." Mauri v. Smith , 324 Or. 476, 482, 929 P.2d 307 (1996) (internal quotation marks *193 omitted). And, "[i]t is now well established in Oregon that damages may be recovered for violation of privacy." McLain , 271 Or. at 554, 533 P.2d 343. Tortious invasion of privacy is one of the limited number of torts in Oregon in which a plaintiff may be awarded damages consisting solely of mental suffering caused by the violation. Hinish , 166 Or. at 506, 113 P.2d 438.
Based on social and legal norms, discussed above, we conclude that, for purposes of Article I, section 9, defendants in this case had privacy interests in their garbage **764 that had been placed within a closed, opaque container and put out at curbside for collection by the sanitation company. Like the court in Hinish over three quarters of a century ago, we recognize, given the realities of living in modern society, which is experiencing its own significant social and technological changes, that privacy norms exist notwithstanding some limited public exposure of information, in this case, putting out garbage in a closed bin for pickup by the sanitation company at curbside, an area accessible to members of the public other than the sanitation company.
Nothing about the relationship among the actors in this case or the respective obligations of defendants and Republic with respect to the garbage at issue here suggests that defendants had left their garbage for police or other government officials to search. There is no evidence that defendants had interacted at all with the Lebanon police concerning their garbage, and so no words or conduct on their part expressed that they were abandoning their garbage to the police or allowing them to search it when they placed the garbage at curbside for pickup. Rather, defendants were obligated by city ordinance to remove waste from their home on at least a weekly basis. Under section 8.16.140(B) of the Lebanon Code of Ordinances, "[e]very person who generates or produces solid waste or wastes shall remove or have removed all putrescible wastes at least every seven days." The required frequency of removal was "to prevent health hazards, nuisances, or pollution." Id. Thus, as mandated, defendants had weekly garbage collection through Republic, in the customary way for Lebanon residents. For its part, Republic was required by section 8.16.070(a) of the Lebanon Code of Ordinances to "[d]ispose of solid waste collected at a DEQ approved site or recover resources from the solid waste, both in compliance with Chapters 459 and 459A, Oregon Revised Statutes, together with rules and regulations promulgated thereunder." The city's Code of Ordinances, however, did not authorize Republic to transfer collected garbage to third parties for searches. At bottom, defendants, Republic, and the police all understood that, had Republic's manager not taken the garbage to the police at their request, defendants' garbage would have been commingled with the garbage of hundreds of other households **765 and dumped in a landfill, obscuring, as a practical matter, that defendants' garbage in particular contained evidence of drug possession.
We acknowledge that the United States Supreme Court has come to a different conclusion in applying the Fourth Amendment of the United States Constitution. See Greenwood , 486 U.S. at 41, 108 S.Ct. 1625 (holding that there is no reasonable "expectation of privacy in trash left for collection in an area accessible to the public"). In Greenwood , the police had requested on multiple occasions that a sanitation hauler specially collect the defendants' plastic garbage bags, left for curbside collection in front of their house, and give them to the police, who then searched the bags. The majority concluded that those defendants had no reasonable expectation of privacy because they had "exposed their garbage to the public" and had left the garbage "for the express purpose of conveying it to a third party, the trash collector, who might himself have sorted through" it. Id. at 40, 108 S. Ct. 1625. However, the Court's rationale for that holding is subject to criticism, as the dissent in that case and a variety of courts and commentators have well explained.
For example, the dissenters in Greenwood noted, in response to the rationale that the garbage had been left exposed in an area to which the public had access, that the defendants had only exposed "the exteriors of several opaque, sealed containers," and, "[u]ntil the bags were opened by police, they hid their contents from the public's view[.]"
*194 Id. at 53, 108 S. Ct. 1625. As for the rationale that it was possible for the sanitation company worker or others to have opened the bags, the dissent wrote:
"The mere possibility that unwelcome meddlers might open and rummage through the containers does not negate the expectation of privacy in their contents any more than the possibility of a burglary negates an expectation of privacy in the home; or the possibility of a private intrusion negates an expectation of privacy in an unopened package; or the possibility that an operator will listen in on a telephone conversation negates an expectation of privacy in the words spoken on the telephone. 'What a person ...
**766 seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.' "
Id . at 54, 108 S.Ct. 1625 (quoting Katz v. United States, 389 U.S. 347, 351-52, 88 S. Ct. 507, 19 L.Ed. 2d 576 (1967) ). Similarly, the New Jersey Supreme Court in Hempele responded to the majority's statement in Greenwood that "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties," id. at 41, 108 S. Ct. 1625, by observing that Greenwood had not exposed evidence to a third party but rather had conveyed an opaque bag containing the evidence, thereby preserving his privacy interest in the contents of the bags. 120 N.J. at 208, 576 A.2d at 806. See also Wayne R. LaFave, 1 Search and Seizure § 2.6(c) 897-98 (5th ed. 2012) (concluding that "people intend that their refuse, though placed outside their dwelling for collection, remain private" and "a society in which all our citizens' trash cans could be made the subject of police inspection for evidence of the more intimate aspects of their personal life upon nothing more than a whim is not free and open") (quotations and footnotes omitted); Hempele , 120 N.J. at 204-10, 576 A.2d at 804-07 (rejecting the state's reliance on the rationale in Greenwood ).
But whatever one's view of the Court's decision in Greenwood , the Court correctly observed that "[i]ndividual States may surely construe their own constitutions as imposing more stringent constraints on police conduct than does the Federal Constitution." Id. at 43, 108 S. Ct. 1625. We are not the first such court to conclude that our state constitution imposes more stringent constraints than the federal constitution, as our references to Hempele make clear. Other courts, although a minority nationally, have reached the same conclusion under their state constitutions. See State v. Crane , 2014-NMSC-026, 329 P.3d 689 (2014) ; State v. Goss , 150 N.H. 46, 834 A.2d 316 (2003) ; State v. Morris , 165 Vt. 111, 680 A.2d 90 (1996) ; State v. Boland , 115 Wash. 2d 571, 800 P.2d 1112 (1990) ; State v. Tanaka , 67 Haw. 658, 701 P.2d 1274 (1985) ; People v. Krivda , 5 Cal. 3d 357, 96 Cal. Rptr. 62, 486 P.2d 1262 (1971), vacated and remanded , 409 U.S. 33, 93 S. Ct. 32, 34 L.Ed. 2d 45 (1972), reaff'd , 8 Cal 3d 623, 105 Cal. Rptr. 521, 504 P.2d 457 (1973), cert. den. , 412 U.S. 919, 93 S.Ct. 2734, 37 L.Ed.2d 145 (1973). We agree with those state courts that people do not voluntarily **767 expose their private effects to government officials when they place their garbage in opaque, closed garbage bins at curbside for collection by their community's garbage hauler.
C. The Sanitation Company Manager as Police Agent
Although the parties agree that the trial court correctly concluded that the sanitation company manager had acted as an agent of the police when he picked up defendants' garbage bin and delivered it to the police for a search, they disagree regarding the significance of that conclusion. Because it will inform our subsequent discussion, we examine the legal grounding for that conclusion before addressing whether defendants still retained their privacy interests in their garbage when the police went through it.
It is axiomatic, we noted in State v. Sines , 359 Or. 41, 50, 379 P.3d 502 (2016), that Article I, section 9, applies only to government-conducted or -directed searches and seizures, not those of private citizens. Accord. State v. Tanner , 304 Or. 312, 321, 745 P.2d 757 (1987) ("A section 9 privacy interest is an interest against the state; it is not an interest against private parties.").We also recognized in Sines that
*195 "situations can and do arise in which a private citizen's conduct in pursuing his or her own search and seizure may become so intertwined with the conduct of a state actor that the private citizen's actions are essentially those of the state and should be subject to constitutional restrictions on state searches and seizures."
359 Or. at 50, 379 P.3d 502.
At issue in Sines , a child sex abuse case, was whether a private citizen acting on her own volition-the defendant's housekeeper-had nevertheless served as a police agent when she gave local police an unwashed pair of underwear belonging to the defendant's young adopted daughter. In formulating a rule and to guide the analysis, we opined that "common-law agency principles can provide substantial assistance in determining when a private citizen's search or seizure should be considered state action for purposes of Article I, section 9." Id . at 55, 379 P.3d 502. Turning to those principles, and relying on a section of the Restatement (Third) of Agency , we concluded that
**768 "[c]ommon-law agency exists where a principal 'manifests assent to another person'-the agent-that the agent 'shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.' Restatement (Third) of Agency § 1.01 (2006)."
Id .See also Vaughn v. First Transit, Inc ., 346 Or. 128, 135, 206 P.3d 181 (2009) (holding that an agency relationship " 'results from the manifestation of consent by one person to another that the other shall act on behalf and subject to his control, and consent by the other so to act' " (quoting Hampton Tree Farms v. Jewett , 320 Or. 599, 617, 892 P.2d 683 (1995) ).
In Sines , we ultimately concluded that, under common-law agency principles, an agency relationship had not existed due to a lack of "affirmative encouragement, initiation, or instigation" from the police seeking action from the housekeeper on their behalf. 359 Or. at 60, 379 P.3d 502. That, however, is not the factual posture present here.
In this case, it is undisputed that the police solicited the sanitation company manager to specially pick up and bring defendants' garbage to them and the sanitation company manager obliged that request. There is no question, then, that there was mutual assent to the agency relationship. Under the common-law agency principles discussed in Sines , therefore, the police-the principals-and the sanitation company manager-their agent-entered into an agency relationship, the goal of which was to procure defendants' garbage bin for the police to conduct a search of its contents.
The trial court found that Republic's manager had "acted exclusively at the request and direction of the police," and we are bound by that finding. See State v. Ehly , 317 Or. 66, 75, 854 P.2d 421 (1993) (holding that, in reviewing denial of motion to suppress evidence, court is bound by trial court findings of historical fact "if there is constitutionally sufficient evidence in the record to support those findings"). Thus, it cannot be said that the sanitation company discovered suspicious evidence in the course of its regular operations and volunteered to give that evidence to the police, as was the case in Sines . Nor can it be said that the police happened **769 upon evidence lying in plain view or that the police obtained the sanitation company's consent to go through defendants' garbage once the sanitation company, as usual, had picked it up with its mechanized garbage truck. What can be said is that the police procured defendants' garbage bin, with its contents segregated from the garbage of hundreds of other households, by engaging the services of Republic's manager to act as its agent.
D. Did the Police Violate Defendants' Rights under Article I, Section 9 ?
We are left with the key controversy at hand: whether defendants retained, and the police invaded, privacy interests in the contents of their garbage bin after the police received the bin from Republic's manager and went through its contents. There is no question that defendants did not know that the police would take their garbage bin away with the help of an agent and search it, nor *196 did they agree to such a search. And there is no question that defendants did not tell the police or the sanitation company that, by leaving their garbage bin at the curb for Republic's mechanized garbage truck to empty it and haul away the garbage, commingled with garbage from other households, they were intentionally relinquishing their privacy in the contents of their garbage bin.
Having never agreed to nor authorized the transfer of their garbage to the police, defendants argue that they retained protected privacy interests in their garbage, which the police invaded when they searched it without a warrant. For its part, the state implicitly contends that it did not interfere with defendants' privacy interests when the police went through the garbage. In the state's view, defendants "lost" those interests when the sanitation company manager picked up defendants' garbage bin. For that proposition, the state relies on Purvis and Howard/Dawson . Defendants, however, argue that those cases are distinguishable and, alternatively, that we should overrule them.
In light of the parties' arguments, we first examine Purvis and Howard/Dawson in detail. We acknowledge that it is possible to read those cases as broadly holding that, once a private actor takes possession of a person's garbage, that **770 person loses any privacy interests in the garbage. However, given our recent decision in Sines , and an earlier case involving police use of private actors, Tucker , 330 Or. 85, 997 P.2d 182, we explicitly renounce such a broad reading. Indeed, as explained in greater detail below, we conclude that Oregonians do not "lose" privacy interests in their garbage when the police direct a private actor to facilitate the government's search by picking up garbage bins left at curbside for regular trash pick-up day. And, to the extent that Purvis and Howard/Dawson hold otherwise, we disavow those holdings.
1. Purvis and Howard/Dawson
In Purvis , decided in 1968, Eugene police had received a tip from employees at a local hotel who believed that one of the hotel's guests was using "narcotics" in his room, the suspected drug in question being marijuana. Purvis , 249 Or. at 405, 438 P.2d 1002. A police detective was dispatched to the establishment, where he enlisted the help of two women who were hotel employees and who were cleaning the rooms on the defendant's floor. The detective told the workers to keep any trash that they removed from the defendant's room separate from other trash collected in their cleaning rounds so that the detective could examine it. Id . The detective also told the workers to look for "homemade cigarettes." Id. After entering the defendant's room, emptying ash trays and waste baskets into a cardboard box, and taking the box to the detective as he waited down the hall, the workers returned to the room to complete their cleaning and discovered on the floor a cigarette remnant of the type described by the detective. Id. at 406, 438 P.2d 1002. Once the workers brought that to him, the detective sought out and arrested the defendant for illegal possession of narcotics. Id .
The defendant unsuccessfully sought to suppress the evidence gathered in the hotel room as a warrantless search; he was subsequently convicted on a single count of possession and sentenced to probation. In rendering that judgment, the trial court did not find that the hotel workers had acted on the state's behalf or for its benefit in cleaning the defendant's room. Instead, as set out in the abstract of record on review, the trial court expressly found that "at all times while the maids were cleaning Room 705, they were **771 operating and acting in the ordinary course of their business as maids and conducted no unusual search or discovery procedure[.]" Appellant's Opening Brief at 3, State v. Purvis , 249 Or. 404, 438 P.2d 1002 (1968).
On appeal from his conviction, the defendant took issue with that finding. At the time, the parties did not have the benefit of the agency analysis that this court articulated in Sines to determine whether actions taken by a private actor constitute a search conducted by a government agent. Instead, the applicable rule at the time-cited by both parties among their primary points of law-focused on whether a private party search had either been conducted in collusion with *197 police officers or had been marked by actual officer involvement:
"Private persons may search the premises of another without constitutional restraint unless there is police collusion or the police participate in the search in any manner ."
See Appellant's Opening Brief at 14, State v. Purvis , 249 Or. 404, 438 P.2d 1002 (1968) (setting out controlling propositions of law); Respondent's Brief at 2, State v. Purvis , 249 Or. 404, 438 P.2d 1002 (1968) (same).
Drawing upon that rule, the defendant asserted that
"[t]he hotel maids were not performing their duties alone but were acting as agents of, and in concert with, the officer who did not immunize himself from the constitutional safeguard [of a warrant] by lying in wait 30 feet down the hallway from the room. Since the search of the hotel room was warrantless and not as an incident to any lawful arrest it was illegal."
Appellant's Opening Brief at 20-21, State v. Purvis , 249 Or. 404, 438 P.2d 1002 (1968). A majority of this court, however, disagreed with the defendant's position that the hotel workers had acted "as agents of and in concert with" the investigating detective.
While acknowledging that the hotel workers had, in fact, been recruited by the police to carry out a "form of search" in the defendant's room, Purvis , 249 Or. at 410, 438 P.2d 1002, the majority nevertheless held that, based on its reading of the testimony, the trial court had been entitled to regard the **772 detective's request of the workers as limiting the retrieval of evidence from the defendant's hotel room to "items which would otherwise be removed in the normal process of cleaning the room," id. at 409, 438 P.2d 1002. After observing that the items collected had all been destined for the trash and implicitly authorized to be taken out of the room by the hotel workers, the majority opined that the items
"eventually would be available to the police for inspection even if no instructions had been given. Although the cooperation of the maids in keeping the objects from room 705 separate from the objects taken from the other rooms was helpful to the police and, in fact, could be regarded as a part of the process of search, we do not think that the recruitment of the maids by the police for this purpose constituted an invasion of defendant's constitutional right of privacy."
Id . at 410-11, 438 P.2d 1002.
The analytical core of the majority's decision in Purvis contained two parts. Under the first part, personal refuse in a hotel room-or even items that presented as such by being left in receptacles or on the floor-could be construed as abandoned property when hotel workers with the job of regularly collecting that refuse saw the items and collected and removed them while cleaning the room. Under the second part, when the same workers performed the same collections-albeit now at the request of a police officer conducting a criminal investigation-the workers' recruitment for that purpose could not be viewed as collusion with the state because the workers were performing a task that they were otherwise licensed or privileged to perform as part of their job. Under the Purvis rationale, the hotel workers were private actors who had picked up an abandoned marijuana cigarette in the defendant's hotel room as part of their regular duties and then given it to the police, and the police involvement did not constitute collusion or participation in a warrantless search of the defendant's hotel room.
A lone dissenter in Purvis , however, advanced a contrary view, opining that the governmental intrusion permitted by the majority would one day require nullification as "too vicious" to endure. Purvis , 249 Or. at 417, 438 P.2d 1002 (Sloan, J., **773 dissenting). That was so, the dissent wrote, because the majority's rule
"would necessarily apply to any other person who can, at the insistence of government agents, permissively enter an office or a home or any other place. It is rather shocking to realize that any unfaithful or naive employee or trusted neighbor can ransack a business office or home and bring to the waiting police whatever the searcher may choose to believe is debris. The majority imposes no other test. That, *198 in itself, is bad enough, but the majority permit the police to instruct and direct the employee as to what he should look for. Even in the heyday of the silver platter rule[5 ], the Supreme Court would not tolerate the participation of federal agents in a search like that permitted by the majority today."
Id. at 411-12, 438 P.2d 1002 (Sloan, J., dissenting).
Nearly 40 years later, Purvis would become the cornerstone of this court's decision in Howard/Dawson , a case nearly identical in its facts to the matter now before us. In Howard/Dawson , authorities had learned that one of the defendants had made substantial purchases of a precursor chemical used to manufacture methamphetamine. Armed with that information-but no warrant-police officers asked the sanitation company that collected the defendants' household garbage to pick it up at their home and convey it directly to them for inspection. The company complied with that request and, during two regularly scheduled pick-ups at the defendants' residence, collected their garbage container and its contents, replaced it with an empty container, and immediately turned the full container over to a police officer. Based on evidence gleaned from those searches, the police obtained a warrant to search the defendants' residence, **774 where they uncovered additional evidence of methamphetamine manufacture and use. The defendants were charged with various drug crimes and, after an unsuccessful attempt to suppress the evidence taken from the garbage containers, were convicted of the charges against them. Howard/Dawson , 342 Or. at 638-39, 157 P.3d 1189.
On appeal, unlike the defendant in Purvis , the defendants in Howard/Dawson did not argue to the Court of Appeals that the police officers had violated the Oregon Constitution's warrant requirement by recruiting the sanitation company to act as a police agent.[6] Instead, the defendants sought to distinguish the facts of their case from those in Purvis by emphasizing both the possessory and privacy interests that lay in the garbage container removed from their residence at the behest of the police. The defendants argued that, because their household garbage had been deposited in a closed container unavailable for public observation and the container then placed outside the residence for exclusive pick-up by the sanitation company, the defendants' property and privacy interests in that refuse could not be construed as having been abandoned.
Sitting en banc , a divided Court of Appeals disagreed, ultimately concluding that the warrantless searches of the defendants' garbage were not unreasonable under Article I, section 9, of the Oregon Constitution. State v. Howard/Dawson , 204 Or. App. 438, 449, 129 P.3d 792 (2006), aff'd, 342 Or. 635, 157 P.3d 1189 (2007). According to the majority, the defendants had maintained a protected possessory interest in their garbage only until its collection by the sanitation company. At that point, the majority opined, "[f]rom a possessory standpoint, the garbage belongs to the sanitation company." Howard/Dawson , 204 Or. App. at 443, 129 P.3d 792. Citing Purvis , the majority then concluded that the police **775 had not conducted a search of the *199 garbage under Article I, section 9, because the defendants had lost their privacy interests:
"Once that garbage was in the collection company's physical possession and control, defendants' privacy interests in the contents of their garbage can were extinguished, as Purvis instructs. A fortiori , the ensuing police examination of the garbage and confiscation of evidence of defendants' drug activities did not invade a privacy interest protected by Article I, section 9."
Howard/Dawson , 204 Or. App. at 444, 129 P.3d 792.
Three dissenters, however, took issue with the majority's rationale, framing the question before the Court of Appeals as this: "Did the police do something that, if they could do it in similar circumstances whenever they wanted, would diminish the freedom from unwanted government scrutiny to which an Oregonian is entitled?" Id. at 452, 129 P.3d 792 (Schuman, J., dissenting). Answering that question in the affirmative, the dissent took particular aim at the secret use of the sanitation company as an extension of the police officers in that case, indicating that it was
"unwilling to endorse a rule under which government authorities-for good reason, bad reason, or no reason at all-are free, through the expedient of recruited civilians, surreptitiously to arrange for the seizure and subsequent inspection and analysis of the contents of garbage containers that people leave at curbside for pickup and delivery to the dump or recycling facility. Such a rule would result in an unwarranted and significant reduction in the people's freedom from unwanted scrutiny."
Id . at 456, 129 P.3d 792.
This court allowed review to examine the constitutional issue that had divided the Court of Appeals. Howard/Dawson , 342 Or. at 639, 157 P.3d 1189. On review, the defendants again omitted any argument that the sanitation company had acted as a police agent in securing and delivering the defendants' garbage to the police. That caused this court, in turn, to narrow its focus to the defendants' possessory and privacy rights with respect to the garbage, but seemingly by treating the defendants' garbage bin as if the sanitation **776 company had obtained it in the regular course of business and could do whatever it wanted with it, including giving it and its contents to the police.
Echoing the Court of Appeals holding below, this court explained that the sanitation company lawfully possessed the defendants' garbage. Id . at 640, 157 P.3d 1189. This court further concluded that, if anyone had "a constitutionally protected possessory interest, it was the sanitation company, but that company voluntarily turned the property over to the police." Id . (internal citations omitted). Citing Purvis , this court then concluded that the defendants had no privacy interests in the garbage, likening their conduct to abandonment:
"On this record, defendants retained no more right to control the disposition of the garbage once they turned it over to the sanitation company than they would had they abandoned it. As this court consistently has recognized, a person retains no constitutionally protected privacy interest in abandoned property. Indeed, we do not see a material distinction between the facts in this case and the facts in Purvis ."
Howard/Dawson, 342 Or. at 641, 157 P.3d 1189 (internal citations omitted). Consequently, this court affirmed both the appellate decision and circuit court judgments rendered below. Id . at 643, 157 P.3d 1189.
As that decisional history indicates, both Purvis and Howard/Dawson could be understood as holding that, whenever a private actor with authority to take possession of a defendant's garbage does in fact obtain possession, then (1) the defendant has lost possessory rights in the garbage and (2) the defendant no longer has privacy rights with respect to the garbage. The two cases differ in their rationales for concluding that, once the private actor obtained possession, the defendant lost privacy rights in the garbage, but in neither case did this court consider the implications of the relationship between the private actors and the police in light of principles of agency law.
*200 2. Applicable principles of agency law
Here, however, the significance of police involvement in light of principles of agency law is squarely before us. The trial court concluded that the sanitation manager at **777 Republic Services-who had picked up and delivered defendants' garbage bin to police officers at their request-had acted as a state agent in an undertaking that amounted to state action. And, with respect to whether the police invaded their protected interests by going through their garbage, defendants explicitly argue that, under this court's case law in Sines and Tucker , the manager's role as an agent of the police matters in considering whether they retained privacy interests in their garbage after the manager took their garbage bin and delivered it to the police.
In Sines , as noted earlier, this court concluded that "common-law agency principles can provide substantial assistance in determining when a private citizen's search or seizure should be considered state action for purposes of Article I, section 9." 359 Or. at 55, 379 P.3d 502. The court looked to "objective manifestations" by the government authorities-affirmative conduct such as "encouragement, initiation, or instigation"-to determine whether the state had "vicarious responsibility" for the housekeeper's private search in Sines . Id. at 60, 379 P.3d 502.
In Tucker , this court held that, "if a state officer requests a private person to search a particular place or thing, and if that private person acts because of and within the scope of the state officer's request , then Article I, section 9, will govern the search." 330 Or. at 90, 997 P.2d 182 (emphasis added). In Tucker , a state trooper had investigated a single-vehicle rollover accident in which both the driver and passenger had been taken to the hospital and the vehicle towed from the crash site. Id . at 87, 997 P.2d 182. The trooper, however, developed reason to believe that the passenger had falsely identified himself and called the tow truck driver, asking him to search the towed vehicle for items that might help determine the passenger's identity. In the warrantless search of the vehicle that followed, the tow truck driver found a gun in a camera case, the discovery of which-along with the passenger's identity and his status as a convicted felon-led to the passenger's conviction as a felon in possession of a firearm. Id . at 87-88, 997 P.2d 182.
On review, this court concluded in Tucker that, because the tow truck driver had acted within the scope of **778 the trooper's request when he looked into the camera case, he was acting as the trooper's agent. Id. at 90, 997 P.2d 182. Consequently, this court held that the trial court should have excluded the evidence that the tow truck driver had discovered, as the product of a warrantless search prohibited by Article I, section 9, and reversed the conviction. Id. at 91, 997 P.2d 182.
In this case, applying Sines and Tucker , it is apparent that it was the state's decision-not the independent decision of a private actor-to procure defendants' garbage bin for police inspection. Defendants had privacy interests in their garbage as their bin sat at the curb for regular collection by the sanitation company. The sanitation company manager then acted as a police agent when he picked up defendants' garbage bin before the mechanized garbage truck arrived, replaced that bin with an empty one, and transported their garbage bin to the waiting police officers for a search. Because the police directed that private actor, Republic's manager, to segregate and then to bring their private information in their garbage to the police for exposure in a search, the police bear responsibility for invading defendants' privacy interests in their garbage.
The reasoning in Purvis does not remain viable in light of Sines and Tucker . It is important to understand that the defendant in Purvis had argued that his privacy right had been invaded through a warrantless search of his hotel room. That is, the defendant contended that police had engaged in a search by asking the hotel workers to look for homemade cigarettes while cleaning the room and segregating its trash. Purvis , 249 Or. at 411, 438 P.2d 1002. The Purvis majority determined that, because the hotel workers had been authorized to clean the defendant's room and had performed that task as they normally did, they had simply given the police access to the trash that they would have, in any event, taken out of the room as *201 part of their duties. See id. at 408, 438 P.2d 1002 (explaining that the cigarette "would be removed in the usual course of cleaning the room"); id. at 410, 438 P.2d 1002 (explaining that the workers were authorized to clean the room and to remove trash, including the cigarette). In doing so, however, the court acknowledged that, while the contraband had remained in the hotel room, "the police were not entitled to seize it * * * **779 because the right to the privacy of the room itself would be invaded by such a seizure." Id. at 411, 438 P.2d 1002.
Thus, the majority in Purvis expressly recognized the defendant's right to privacy in his room, while at the same time recognizing that the hotel workers had been recruited by a police officer to perform an act that, had the police officer performed it, would have violated that privacy right. The majority did not attempt to reconcile those competing ideas by reference to any tenet of Oregon agency law, opting instead to summarily state: "[W]e do not think that the recruitment of the maids by the police for this purpose constituted an invasion of defendant's constitutional right of privacy." Id. at 411, 438 P.2d 1002.
But as both Sines and Tucker reflect, in the ensuing 50 years since Purvis was decided, this court has had time to reflect and to recognize that it is the state that must be viewed as the culpable actor when (1) police officers expressly solicit private parties to serve as police agents; (2) those agents subsequently act upon, and within the scope of, the officers' requests; and (3) the agents' actions are aimed at procuring evidence for the state's use in criminal investigations or prosecutions. As we summarized in Sines ,
"our cases make clear that Article I, section 9, is a restriction on government searches and seizures, not private ones. Government generally acts, of course, through government employees, but it may also act through nonemployee agents, and searches or seizures by those agents are subject to constitutional protections."
359 Or. at 53, 379 P.3d 502. Now, in employing Sines and Tucker as the lenses through which we must examine the police recruitment of the hotel workers in Purvis , the conclusion that those workers did not facilitate an invasion of the defendant's privacy rights as police agents in the search is no longer supportable. Accordingly, we overrule that holding in Purvis as inconsistent with this court's decisions in Sines and Tucker . See Horton v. Oregon Health and Science University , 359 Or. 168, 186-87, 376 P.3d 998 (2016) (discussing considerations for overruling prior case, including that the prior case was wrongly decided based on (1) an inadequate legal analysis or (2) because the legal or factual context for the prior decision **780 has changed in a way that seriously undermines the reasoning or the result of the earlier decision).
We reach the same conclusion with regard to Howard/Dawson . This court's decision in that case was premised largely on the notion that Howard/Dawson and Purvis were factually the same and, by extension, required the same outcome. See Howard/Dawson , 342 Or. at 641, 157 P.3d 1189 ("[W]e do not see a material distinction between the facts in this case and the facts in Purvis ."). Indeed, in Howard/Dawson , the court cited Purvis for the proposition that the defendants in Howard/Dawson "retained no more right to control the disposition of the garbage once they turned it over to the sanitation company than they would had they abandoned it." Id . That observation, however, like similar observations in Purvis , was premised on the unsupported notion that the government action implicating the protections of Article I, section 9-the agency relationship between the police and the garbage company-was somehow abrogated by the garbage company's preexisting authorization to pick up the defendant's garbage, police request or not. In Howard/Dawson , this court assumed that, once the sanitation company manager-the private actor-took possession of the garbage, the defendants no longer had any "right to control the disposition of the garbage" and then assumed that, like people who had "abandoned" their property, the defendants had no rights with respect to the garbage whatsoever. This court then assumed that the private actor who had possession of the garbage could choose to do what he wanted with the defendants' garbage, including *202 exposing the garbage to third parties, even the police.[7]
But as explained above, common law agency principles now require us to view the police officers in Howard/Dawson as the principals who, through use of their agent, were vicariously responsible for segregating and procuring the contents of defendants' garbage bin for exposure to police search, thereby invading defendants' privacy rights without a warrant. Thus, our previous holding in Howard/Dawson that the defendants in that case had no privacy **781 rights in their garbage because the sanitation company had collected it under a privilege to do so can no longer be viewed as correct. Consequently, we overrule that part of Howard/Dawson for the same reasons that we have overruled Purvis .[8]
Having overruled those two cases, we reject the state's contention that the police officers in the case now before us did not "search" defendants' garbage under Article I, section 9. The state itself-not a private actor acting independently of the police-took defendants' garbage bin and then went through its contents. For reasons we have discussed above, including social norms reflected in cases from this and other courts and common law tort principles reflecting legal norms, that conduct plainly invaded defendants' constitutionally protected privacy interests.[9]
**782 "Subject to certain limited exceptions, a search or seizure is unreasonable and, therefore, unlawful under Article I, section 9, unless it is supported by probable cause and a warrant." State v. Barnthouse , 360 Or. 403, 413-14, 380 P.3d 952 (2016). The state lacked a warrant when its agent, having taken defendants' garbage bin, turned it over to the police, who then searched its contents. Accordingly, the state bears the burden of proving the validity of the warrantless search. ORS 133.693(4) ; Tucker , 330 Or. at 89, 997 P.2d 182. In this case, the state has failed to meet its burden. Because the state violated defendants' Article I, section 9, rights, the trial court erred in denying their motions to suppress the evidence obtained as a result of the unlawful search of their garbage. [10]
*203 The decision of the Court of Appeals is reversed. The judgments of the circuit court are reversed, and the cases are remanded to the circuit court for further proceedings.
Kistler, S. J., dissented and filed an opinion.

We therefore need not address whether the trial court correctly concluded, in derogation of Galloway , that defendants had abandoned all constitutionally protected interests in their garbage upon taking out and leaving their garbage bin at the curb before the sanitation company manager arrived.

Relying on Howard/Dawson , the dissent contends that whether defendants had a privacy interest in the garbage that the police officers obtained should turn instead on whether defendants had possessory interests in the garbage. State v. Lien , 364 Or. 750, 782, 786, 787, 441 P.3d 185 (2019) (Kistler, J. dissenting). But as our precedents reflect, a person's possessory interest in property is not the touchstone of whether a person has a privacy interest protected by Article I, section 9.

See Lebanon Code of Ordinances § 8.16.040.

Section 652B of the current Restatement is identical, except that the phrase "a reasonable man" has been changed to "a reasonable person."

Before 1960, the "silver platter doctrine" had permitted federal courts to receive evidence from searches conducted by state-level police officers that would have violated the Fourth Amendment if conducted by federal officers. See State v. Davis , 313 Or. 246, 252, 834 P.2d 1008 (1992) (so stating). The doctrine was based on the rationale that the Due Process Clause did not incorporate the Fourth Amendment into its framework, thus excluding state police action from Fourth Amendment scrutiny or sanction. In 1960, however, the United States Supreme Court decided Elkins v. United States , 364 U.S. 206, 80 S. Ct. 1437, 4 L.Ed. 2d 1669 (1960), and held that evidence obtained in violation of the Fourth Amendment "is not admissible in state or federal court, regardless of where or by whom it was obtained." Davis , 313 Or. at 252, 834 P.2d 1008.

Recognizing that fact, the dissent in the Court of Appeals in Howard/Dawson observed:
"Defendants do not argue that police are also prohibited from circumventing that constitutional limitation on their authority by recruiting private citizens to conduct the seizure for them. That remains an open question under the Oregon Constitution."
State v. Howard/Dawson , 204 Or. App. 438, 450 n. 1, 129 P.3d 792 (2006), aff'd, 342 Or. 635, 157 P.3d 1189 (2007) (en banc ) (Schuman, J., dissenting).

In light of our decision below, we need not address whether the assumptions that the court made were correct.

The dissent would preserve the holding in Howard/Dawson . It argues that Sines did not give the court an opportunity to explain how a "private actor's status as an agent would affect the analysis of whether her actions constituted a search or seizure" and that the sanitation company manager, though a police agent, did not violate any possessory or privacy interest of defendants. Lien/Wilverding , 364 Or. at 789-90, 441 P.3d at 206-07 (Kistler, J. dissenting). But the dissent fails to acknowledge that Sines explained that agency principles inform the analysis not of whether a private actor violated interests protected by Article I, section 9, but whether the government violated those interests. Agency law (and Sines ) clarifies that, in the principal-agent relationship that existed between the police officers and the sanitation company manager in this case, the police officers in their role as the principals had legal responsibility for the police agent's action in obtaining defendants' garbage for the search:
"When one employs a servant or agent to do his work, the employer is, in the eyes of the law, the actor. The damages caused by the activity are the master's responsibility, so long as it is the master's business that is being done."
Gossett v. Simonson , 243 Or. 16, 23, 411 P.2d 277 (1966). Contrary to the dissent's view, Lien/Wilverding , 364 Or. at ----, --- P.3d at ---- (Kistler, J. dissenting), the police agent took actions on behalf of the police officers outside of Republic's usual or ordinary course of hauling residential garbage to the dump to help the police investigate defendants, as he acknowledged in his testimony. To reach its ultimate conclusion, the dissent downplays the fact that the police-not the sanitation company-instigated and controlled the search of defendants' garbage, having orchestrated that search by initially procuring an agent from the sanitation company to segregate the garbage and deliver it to them.

The dissent questions how the privacy interest recognized in this case and the role of a private party acting as a government agent will factor into future cases, intimating that, ultimately, law enforcement may lose the ability to investigate criminal activity through a variety of means, such as police-controlled drug buys, confidential informants, or cooperating witnesses. Lien/Wilverding , 364 Or. at 794, 795, 441 P.3d at 209, 209-10 (Kistler, J. dissenting). It is apparent that cases involving those kinds of investigations can involve a myriad of contexts, and the mere fact that the police have used an agent does not necessarily translate into an invasion of privacy interests protected by Article I, section 9, or any other constitutional violation.

The state conducted a search of the house after obtaining a warrant, but the probable cause for that warrant was dependent on the evidence that the police found in the warrantless search of defendants' garbage. Defendants also moved to suppress evidence obtained from the search of the house.